19704

Benjamin Kenneth GORE, Appellant, v. William D. LEEKE, Director, South Carolina Department of Corrections, Respondent.

(199 S. E. (2d) 755)

*Laughlin McDonald, Esq.*, of Columbia, *for Appellant,* cites:

310.

*Messrs. Daniel R. McLeod, Atty. Gen., Emmet H. Clair* and *Robert M. Ariail, Asst. Attys. Gen.,* of Columbia, *for Respondent,* cite:

October 12, 1973.

BUSSEY, Justice:

At the January 1970 term of the Court of General Sessions for Beaufort County the appellant Gore, along with two co-defendants, Roper and Phillips, was convicted of the crime of murder and sentenced to life imprisonment. Motions for a directed verdict in his behalf, for an order setting aside the verdict and for a new trial were denied. Upon his trial he was represented by court appointed counsel who,

following his conviction, filed a timely notice of appeal in his behalf. Gore then retained other counsel to represent him on appeal who, however, failed to timely perfect the same, a motion by such counsel to allow him to belatedly perfect such appeal being denied by this Court by order dated December 14, 1970.

Thereafter, Gore filed an application for post-conviction relief, such relief, however, being denied, after a full hearing, by an order of The Honorable W. L. Rhodes, dated April 22, 1972. At such hearing Gore was represented by retained counsel who prosecutes the present appeal. In a related case Gore's conviction of grand larceny was affirmed by this Court. *State v. Gore,* 257 S. C. 330, 185 S. E. (2d) 826.

The present appeal purports to be from the order of Judge Rhodes, but actually such is not the case. No one of the numerous exceptions imputes any error whatsoever to Judge Rhodes in denying postconviction relief. With one exception, the appeal is actually from the original conviction and sentence and the contemporary orders of the court in connection therewith. The single exception is the contention that the failure of Gore's then retained counsel to timely perfect his appeal amounted to a denial of his constitutional right to effective assistance of counsel at a vital or critical stage of the proceedings against him. The record now before us reflects certain factual matters now brought fully to the attention of this Court when it, in December 1970, denied the motion by Gore's then retained counsel to be allowed to file a belated appeal. In view of this circumstance and to remove any question of infringement of Gore's constitutional rights by the failure of his counsel to perfect the original appeal, we have decided to review the entire record and pass upon all questions raised and argued just as if the original appeal had been timely perfected and filed.

On the 15th day of August, 1969, between 3 P.M. and 4 P.M. the residence of the Lawson family on Hugenin Street, in a residential area in Beaufort County, was broken

into by two or more men who stole and conveyed therefrom various personal property of the value of approximately $5,000.00, including two pistols, two, bags of money, a camera and a safe weighing some seven or eight hundred pounds, which contained a coin collection. Mrs. Lawson accompanied by two children returned to the residence while the crime was in progress. She saw Roper and Phillips in and about the premises but did not see Gore or any other third person. Mrs. Lawson, accompanied by the children, ran to the home of a neighbor, across the street, to call the police. The automobile used in the commission of the crime belonged to Gore's wife, and earlier in the day Gore and Phillips were seen together at the home of Gore's father-in-law in Beaufort County. Within a few minutes after Mrs. Lawson surprised the thieves, and within a few blocks of the Lawson home, three men were seen in the Gore automobile.

In response to Mrs. Lawson's call a deputy sheriff was dispatched but through an error in communication went to the wrong address. Nevertheless, in the general vicinity he encountered and almost had a collision with the Gore automobile. The deputy turned and gave chase. The deck lid of the Gore automobile flew up disclosing the Lawson safe therein. In response to a radio call from the deputy, one Woods, a highway patrolman, joined the pursuit of the Gore automobile, which ended when the pursued car collided with another at the entrance to the Marine Air Station on U. S. Highway 21, a point some five miles distant from the Lawson home. Phillips, Roper and Gore exited from the Gore automobile and gunfire ensued. Patrolman Woods was shot and killed by Phillips who commandeered the automobile of one Holifield, the fatal shot being fired by Phillips as he was leaving the scene in the Hollifield car. Phillips thereafter drove the Hollifield car to a point about six miles from Charleston before letting Hollifield, his wife and child out of the car.

As the culprits alighted from the Gore automobile at the scene of the fatality, Roper had a gun in his hand which was

somehow dropped unfired, Roper running for the woods and being shot by a party upon the scene who picked up Patrolman Woods' gun after Woods was fataly shot, and used it to wound Roper in flight. Gore also ran from the scene toward the woods and was wounded by the deputy sheriff. One witness testified that Gore had a gun in his hand, but there was no evidence that Gore fired a shot, and the gun he allegedly had was never recovered or identified. Gore was unarmed when apprehended the following day.

The pistol with which Phillips fired the fatal shot was never recovered and it may or may not have been the .38 caliber pistol taken from the Lawson home, which was likewise never recovered. Aside from the pistols taken from the Lawson home, the evidence disclosed the culprits were armed with a shotgun, in the hands of Roper in the course of the housebreaking and larceny; the pistol dropped by Roper after getting out of the Gore automobile at the scene of the homicide; the pistol seen by one witness in the hand of Gore but not recovered; and the pistol used by Phillips to fire the fatal shot, if, perchance, it was other than the one taken from the Lawson home. All property stolen from the Lawson home, other than the .38 caliber pistol, was still in the Gore automobile after the fatal shooting.

Since Gore did not fire the fatal shot he was, of course, convicted under what has become called the "felony-murder rule", in connection with which the trial judge charged the jury as follows:

"Now, ladies and gentlemen of the jury, if several persons agree or conspire to commit a felony such as grand larceny or robbery or burglary, each of those persons is criminally responsible for the acts of his associates or confederates which are done in furtherance or in prosecution of the common purpose for which they combined. The common purpose, ladies and gentlemen, may have not included or may not have been involved in the killing and the murder of anyone but if in executing this common design and pur-

pose and if it were unlawful as, for instance, breaking in and stealing, and in the execution of this common purpose a homicide is committed by one of the confederates or one of the associates and you, the jury, determine from the proof beyond a reasonable doubt that the homicide was a probable or natural consequence of the acts which were done in pursuance of this common design then, ladies and gentlemen, all who are present, either actually or constructively, and participating in the unlawful, common design are as guilty as the slayer himself."

Gore's principal contention appears to be that his conviction as a result of the application of the felony-murder rule was in violation of the due process clauses of both the State and Federal Constitutions. In this connection he first argues that the due process clauses require all elements of a criminal charge to be proven beyond a reasonable doubt and that the unconstitutional vice of the felony-murder rule is that its conclusive presumption of malice allows a defendant to be convicted of murder without the State's proving the element of malice beyond a reasonable doubt. He cites no in point authority for this contention and we know of none. What he refers to as a conclusive presumption is a rule of substantive law rather than a rule appertaining to the offer or burden of proof. Wigmore on Evidence, Sec. 2492. The law itself implies the malice from proof of the felony. While a number of jurisdictions, including Congress, (Title 18, Sec. 1111, U. S. C. A.), have enacted felony-murder statutes, South Carolina has not done so, having instead consistently followed the common law rule. One of the early cases in which the rule was applied is *State v. Smith,* 2 Strob. 77. In *State v. Levelle,* 34 S. C. 120, 13 S. E. 319, in applying the rule, the Court quoted from 1 Russ. Crimes (3d Am. Ed.) 424, the following,

"Whenever an unlawful act, an act *malum in se,* is done in prosecution of a felonious intention, and death ensues, it will be murder."

The Court went on to point out that the act out of which the homicide allegedly arose was an unlawful act, *malum in se,* and a felony. Among other decisions of this Court applying the felony-murder rule are: *State v. Cannon,* 49 S. C. 550, 27 S. E. 526; *State v. Johnson,* 156 S. C. 63, 152 S. E. 825; *State v. Williams,* 189 S. C. 19, 199 S. E. (2d) 190; *State v. Ciesiellski,* 213 S. C. 513, 50 S. E. (2d) 194.

Gore argues that even if it be assumed that the felony-murder rule is not unconstitutional *per se,* its application to him under the facts of this case is constitutionally impermissible. In support of this contention he cites decisions of the United States Supreme Court such as *Tot v. United States,* 319 U. S. 463, 63 S. Ct. 1241, 87 L. Ed. 1519; *United States v. Romano,* 382 U. S. 136, 86 S. Ct. 279, 15 L. Ed. (2d) 210; and *Leary v. United States,* 395 U. S. 6, 89 S. Ct. 1532, 23 L. Ed. (2d) 57, wherein certain statutory presumptions have been held constitutionally invalid. We do not regard any of these decisions as being at all in point or persuasive. They all arose in connection with statutory offenses which were *malum prohibitum* rather than *malum in se.* But even if those cases were applicable, the felony-murder rule would, we think, fully comply with the rationale thereof in that there is a rational connection between the fact proved and the ultimate fact presumed or implied, to-wit: malice from the perpetration of a *malum in se* felony.

Finally, in this connection attention is called to the fact that the felony-murder rule and the application thereof to a homicide committed in connection with the perpetration of "any felony" has been increasingly criticized and/or modified by a number of writers and courts. It is argued that even though the rule might have sufficient justification when its operation is predicated upon the commission of an inherently dangerous felony, there is no room for the logical application of that doctrine where the felony committed was not an inherently dangerous one.

There is an annotation in 50 A. L. R. (3d), commencing at page 397, dealing with the felony-murder doctrine. The

annotation points out that the doctrine is a controversial one and proceeds to deal with various limitations up on the doctrine, one of which is that it is applied only to felonies which are inherently or foreseeably dangerous to human life. It also appears from this annotation that the decisions of the various states are naturally influenced to a large extent by the terminology of the statutes adopted in such jurisdictions. From this annotation it would appear that California is the only jurisdiction which has so far adopted the view that in determining whether or not a felony is inherently or foreseeably dangerous, the court must consider only the elements of the particular felony in the abstract and not the facts of the individual case.

The weight of authority, in other jurisdictions where the question has arisen, appears to be to the effect that both the nature of the felony itself and the circumstances of its commission are to be considered in determining whether a felony is foreseeably dangerous so as to properly invoke the application of the felony-murder rule. A well reasoned decision adopting the latter view is that of *State v. Thompson* (1972), 280 N. C. 202, 185 S. E. (2d) 666, in which the opinion was written by Chief Justice Bobbitt. We quote from the opinion in that case the following pertinent language:

"In our view, and we so hold, any unspecified felony is within the purview of G. S. § 14-17 if the commission or attempted commission thereof creates any substantial foreseeable human risk and actually results in the loss of life. This includes, but is not limited to, felonies which are inherently dangerous to life. Under this rule, any unspecified felony which is inherently dangerous to human life, or foreseeably dangerous to human life due to the circumstances of its commission, is within the purview of G. S. § 14-17."

In that case the felony, in the course of which the homicide was committed, was the daytime breaking and entry of and larceny from a residence, just as is the case at bar.

■ While this Court has not heretofore had occassion to apply the felony-murder doctrine in a situation anything like identical with the facts of the present case, the language used by the trial judge as illustrative of a felony giving rise to the application of the rule "as, for instance, breaking in and steal[ing] * * *" has been repeatedly used and/or approved by this Court. *State v. Cannon, supra; State v. Williams, supra.* Under the facts of this case we are not called upon to decide whether or not the felony-murder rule should, or should not, be applied as to every homicide committed in connection with the commission of *any* and *every* felony whether or not inherently or foreseeably dangerous. No case in point, from even California, has been cited wherein the court refused to apply the felony-murder doctrine under a factual situation such as we have here. Aside from any inherent danger in the breaking and entry of a private residence, and larceny therefrom albeit in the daytime, we have here the added fact that the crime was committed by well-armed felons who were still in the course of escape and asportation of the stolen goods immediately preceding the homicide. We conclude that the appellant's conviction of murder under the felony-murder doctrine was fully justified under the circumstances of this case.

■ Appellant next contends that he was denied due process of law by the fact that one of his co-defendants, Roper, was wearing prison pants during the trial. The only mention in the trial record concerning defendant Roper wearing prison garb come after the charge to the jury. There was no objection by counsel for appellant during the course of the trial and no objection of record noted by counsel for Roper. Gore himself was neatly dressed in civilian clothes and his trial attorney was of the opinion that Gore was not in any maner perjudiced by the fact that Roper wore prison trousers. Gore does not demonstrate wherein he supposedly suffered any legal prejudice as the

result of the garb of his co-defendant, even had the question been raised and/or properly preserved for appeal.

Gore's third question states factually that he had by overt act renounced, abandoned and withdrawn from the scheme prior to the commission of the murder by the co-defendant, with the result that his conviction was in violation of due process. The stated question, however, is not argued. Instead, he takes a phrase, out of context, contained in the trial judge's charge on the law of abandonment of a criminal scheme and argues that such was prejudicial and erroneous. While the challenged phrase was inaccurate, particularly when considered out of context, when it is read in context and in conjunction with the charge in its entirety, we are not convinced that there was any probability of the jury having understood the same in any sense prejudicial to the rights of Gore. Actually, it was given in conjunction with charges requested by counsel for Gore, who obviously detected nothing inaccurate or prejudicial therein as he interposed no objection to such charge. Moreover, no exception on this appeal challenges the charge of the trial judge in this particular, with the result that the issue is not in any manner properly before us.

Gore next contends that there was error on the part of the court in denying his motion for a severance, such motion being grounded upon the following: (1) His co-defendant Phillips was charged with the crime of kidnapping; (2) Phillips was an habitual criminal; (3) The evidence as to him was only circumstantial, while as to the co-defendant, Phillips, it was direct. While the fact of Phillips having commandeered the Hollifield car and taken with him the occupants thereof in the course of his escape was brought out in the course of the trial, there was no mention of whether or not Phillips would be charged with the additional crime of kidnapping, and, of course, no mention in the course of the trial that Phillips was an habitual criminal. Gore does not even attempt to point out wherein

he was in the slightest degree actually prejudiced by the denial of his motion for a severance. It is well established that a motion for severance is addressed to the sound discretion of the trial judge and only an abuse of that discretion constitutes reversible error. *State v. Harvey,* 253 S. C. 328, 170 S. E. (2d) 657; *State v. Britt,* 235 S. C. 395, 111 S. E. (2d) 669; Cf. *Opper v. United States,* 348 U. S. 84, 75 S. Ct. 158, 99 L. Ed. 101.

Finally, Gore contends that the trial judge prejudiced the jury against him by erroneously stating that he, Gore, had made a motion for a change of venue. Prior to the commencement of the trial, Phillips and Roper, through their respective counsel, made motions for a change of venue, which were denied. No such motion was made in behalf of Gore. Preliminary to drawing the jury, the trial court addressed extended remarks to the jury panel in an effort to impress upon the jurors the importance of the individual jurors disclosing to the court, in response to the questions about to be propounded, any reason whatever why an individual juror might be inclined to be anything other than fair and impartial. In the course of these remarks, he told the jury panel that certain motions had been made on behalf of the defendants, among the motions being one for a change of venue. He thus, by implication at least, erroneously attributed to Gore a motion for a change of venue. He went on to tell the jury that the grounds of the motion were extensive publicity; that the deceased was a native of the adjoining county of Jasper and had wide connections among relatives and friends in Beaufort County, and that because of such it would be allegedly difficult for the defendants to get a fair and impartial trial. His Honor then went on to say that he had denied the motion because of his complete confidence and faith in the integrity, ability and fairness of the jury panel and that he had not the slightest doubt that the jurors would extend to the defendants and each of them a fair and impartial trial. He then proceeded to conduct an extensive examination of the venire concern-

ing any possible prejudice or connection with the case, and a number of prospective jurors were excluded by the court for cause.

It is Gore's contention that the court prejudiced him with the jury panel, implications from the court's remarks being, (and the only reasonable inference the juror could reach therefrom), that Gore felt that they could not be fair and impartial. While His Honor might well have refrained from mentioning that any defendant had made a motion for a change of venue, Gore has not convinced us of any prejudice resulting to him from the remarks. Obviously, Gore's able and experienced counsel did not regard the remarks as being harmful or prejudicial and interposed no objection thereto, so that actually the issue is not properly before us. We are satisfied that His Honor's remarks when read in context and considered in their entirety resulted in no actual prejudice to Gore. To the contrary, his remarks were calculated and intended as an extra effort on his part to make certain that no juror who sat upon the case was other than completely fair and impartial.

We are unconvinced of any error and accordingly the judgment of the trial court and the decree of the circuit court denying post-conviction relief are both hereby

Affirmed.

Moss, C. J., and LEWIS, BRAILSFORD and LITTLEJOHN, JJ., concur.