GEATHERS, J.:
**24 Appellant Michael Juan Smith seeks reversal of his conviction for attempted murder. Appellant argues (1) he was entitled to a directed verdict because the State failed to prove he had the specific intent to kill the victim; (2) he was entitled to a mistrial based on improper statements made by the solicitor during her closing argument because the statements violated his due process right to a verdict based only on the evidence of his guilt; and (3) the circuit court erred by instructing the jurors they could infer malice based on the "felony murder rule" because the underlying felonies were not inherently dangerous and involved merely possession of a firearm.[1] We affirm.
FACTS/PROCEDURAL HISTORY
The facts in the light most favorable to the State are as follows. On Sunday, October 13, 2013, at approximately 2 a.m., Appellant and his four companions, Ryan Ellison, Shante Bethel, Asia Bethel, and Taqayya White, were in Columbia's Five Points, which was crowded and noisy, when they encountered a group of three men, Byron Tucker, Donnell Woodard, and Daquan Samuel. The three men flirted with Appellant's female companions, causing tension between these men and Appellant. A silent video shows the men exchanging words with Appellant, but the written record references only one specific word uttered-Donnell Woodard used the word, "slob," which "is a disrespect toward the Bloods,"[2] a notorious gang. Members of Appellant's family as well as several of his friends were members of the Bloods, and Appellant admitted **25 to being an unofficial member of the Bloods.[3] One of Appellant's female companions, Shante Bethel, testified that none of the three men said anything threatening but rather they were merely disrespectful. Likewise, Taqayya White testified that the three men were not intimidating.
Immediately after the confrontation, Appellant, who admitted he had been drinking and "smoking weed" that night, took a gun out of the inside pocket of his jacket, moved it to the outside right pocket, and kept his hand in that pocket. He testified that he and his companions then began walking toward their car and the three men followed them. Appellant also testified, "somebody said they had a gun" and he heard a gunshot, so he cocked his gun to put a round in the chamber and "fired one shot back," intending to target at least one of the three men. Instead, Appellant's bullet struck Martha Childress (Victim) in her chest at the seventh rib and passed *190 through her diaphragm and liver and into her spinal canal, transecting her spinal cord and paralyzing her from the waist down.
White's statement to police contradicted Appellant's testimony that he heard a shot before he fired his gun-she told police that Appellant was the only one who fired a shot that night. His other three companions also testified at trial, admitting they did not see anyone pull out a gun or fire a shot at Appellant.[4] A disinterested eyewitness observed a muzzle flash coming from Appellant but did not see anyone else with a gun.
Tucker gave a version of events that was different from Appellant's version. Tucker, who described Five Points as "Blood territory," testified that after Samuel tried to entice Appellant's female companions with money, Appellant "turned to walk back in [their] direction and then that's when the first **26 shot rang out." Tucker, who did not have a gun that night, ducked, then a second shot "came out."
Officer Theodore McLaughlin with the City of Columbia Police Department testified that he "was standing on the corner of Devine and Harden Street observing the students as they were crossing the street" when he heard one or two gunshots "coming from the fountain area." He then "saw [Appellant] running in the sidewalk dodging ... people on the sidewalk." Officer McLaughlin continued, "[H]e had his right hand in his right coat pocket, and it looked like he was holding something from bouncing. It was a heavy object." Officer McLaughlin caught Appellant in front of Pop's Pizza, grabbing him "at the jacket front and his right pocket," and felt a pistol in that pocket. As Officer McLaughlin reached inside the pocket to retrieve the pistol, Appellant's hand was still on it. Officer McLaughlin pulled Appellant's hand out of the pocket and took the pistol, observing that it was a Glock 27 that was "still warm to the touch." As Officer McLaughlin began to unload the pistol, he noticed there was a round chambered in it.
On November 13, 2013, Appellant was indicted for attempted murder, possession of a weapon during the commission of a violent crime, unlawful carrying of a pistol, possession of a firearm by a person convicted of a violent felony, and possession of a stolen pistol. On December 18, 2013, he was indicted for unlawful possession of a weapon by a person convicted of a crime of violence. The circuit court conducted Appellant's trial on August 10-14, 2015, and August 17, 2015.
At trial, Appellant argued he was acting in self-defense, explaining that he associated with gang members and when he encountered members of a rival gang on the morning in question, he acted to protect himself. The circuit court directed a verdict for Appellant on the stolen pistol charge, and the jury convicted Appellant of the remaining charges. He was sentenced to one year of imprisonment for unlawful carrying of a pistol; thirty years for attempted murder; five years for possession of a weapon during the commission of a violent crime, to run consecutively; five years for possession of a weapon by a person convicted of a violent felony, also to run **27 consecutively; and five years for possession of a weapon by a person convicted of a crime of violence. This appeal followed.[5]
ISSUES ON APPEAL
1. Was Appellant entitled to a directed verdict on the attempted murder charge?
2. Was Appellant entitled to a mistrial based on improper statements made by the solicitor during her closing argument?
3. Did the circuit court err by instructing the jurors they could infer malice based on the "felony murder rule" when the underlying felonies involved possession of a firearm?
*191 4. Did the circuit court's felony murder rule instruction violate State v. Norris ?[6]
5. Did the circuit court's felony murder rule instruction violate State v. Belcher ?[7]
STANDARD OF REVIEW
Directed Verdict
"[W]hen ruling on a motion for a directed verdict, the [circuit court] is concerned with the existence of evidence, not its weight." State v. Butler , 407 S.C. 376, 381, 755 S.E.2d 457, 460 (2014) (quoting State v. Wiggins , 330 S.C. 538, 545, 500 S.E.2d 489, 493 (1998) ). Likewise, on appeal, "this [c]ourt must affirm the [circuit] court's decision to submit the case to the jury" when "the [S]tate has presented 'any direct evidence or any substantial circumstantial evidence reasonably tending **28 to prove the guilt of the accused.' " State v. Hepburn , 406 S.C. 416, 429, 753 S.E.2d 402, 409 (2013) (quoting State v. Cherry , 361 S.C. 588, 593, 606 S.E.2d 475, 478 (2004) ). In making this determination, "this [c]ourt views the evidence and all reasonable inferences in the light most favorable to the State." State v. Pearson , 415 S.C. 463, 470, 783 S.E.2d 802, 806 (2016) (quoting Butler , 407 S.C. at 381, 755 S.E.2d at 460 ).
Mistrial
"The granting or refusing of a motion for a mistrial lies within the sound discretion of the trial court and its ruling will not be disturbed on appeal absent an abuse of discretion amounting to an error of law." State v. Harris , 340 S.C. 59, 63, 530 S.E.2d 626, 627-28 (2000). "An abuse of discretion occurs when the [circuit] court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." State v. Jones , 416 S.C. 283, 290, 786 S.E.2d 132, 136 (2016).
Jury Instructions
"An appellate court will not reverse the trial judge's decision regarding a jury charge absent an abuse of discretion." State v. Mattison , 388 S.C. 469, 479, 697 S.E.2d 578, 584 (2010).
LAW/ANALYSIS
I. Directed Verdict
Appellant asserts he was entitled to a directed verdict on the attempted murder charge because the State was required to show his specific intent to kill Victim and the State could not rely on the transferred intent doctrine to make this showing. We disagree.
We begin by comparing the elements of murder with those of attempted murder. "The elements of the common-law offense of murder are codified at [ section 16-3-10 of the South Carolina Code (2015) ]: ' "Murder" is the killing of any person with malice aforethought, either express or implied.' " State v. Watson , 349 S.C. 372, 376, 563 S.E.2d 336, 337 (2002) (quoting **29 section 16-3-10 ). We find the following definition of "malice aforethought" instructive:
"Malice aforethought" is defined as "the requisite mental state for common-law murder" and it utilizes four possible mental states to encompass both specific and general intent to commit the crime. These four possibilities are intent to kill, intent to inflict grievous bodily harm, extremely reckless indifference to the value of human life (abandoned and malignant heart), and intent to commit a felony (felony murder rule). "General intent" is defined as "the state of mind required for the commission of certain common law crimes not requiring specific intent" and it "usually takes the form of recklessness ... or negligence."
State v. Kinard , 373 S.C. 500, 503-04, 646 S.E.2d 168, 169 (Ct. App. 2007) (citations *192 omitted) (quoting Black's Law Dictionary 813, 969 (7th ed. 1999) ).[8]
Our legislature has defined attempted murder in the following manner: "A person who, with intent to kill , attempts to kill another person with malice aforethought, either expressed or implied, commits the offense of attempted murder." S.C. Code Ann. § 16-3-29 (2015) (emphasis added). Our supreme court recently interpreted this language to mean that the State must show a defendant's specific intent to kill in order to prove attempted murder. State v. King , 422 S.C. 47, 810 S.E.2d 18 (2017).[9] The supreme court also stated, "One cannot be guilty of attempted murder by implied malice because **30 implied malice does not encompass the essential specific intent to kill." Id. at 57, 810 S.E.2d at 23 (quoting Keys v. State , 104 Nev. 736, 766 P.2d 270, 273 (1988) ).
Before we address the transferred intent doctrine, we examine Appellant's specific intent to kill one of the three men with whom he exchanged words on the morning of the shooting. Appellant's argument that he was acting in self-defense is undoubtedly an admission that he intended to use deadly force-he asserts he believed that he had to use deadly force to avoid losing his life or being seriously injured. See State v. Dickey , 394 S.C. 491, 499, 716 S.E.2d 97, 101 (2011) ("A person is justified in using deadly force in self-defense when: (1) The defendant was without fault in bringing on the difficulty; (2) The defendant ... actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, or he actually was in such imminent danger; (3) If the defense is based upon the defendant's actual belief of imminent danger, a reasonable[,] prudent man of ordinary firmness and courage would have entertained the same belief ...; and (4) The defendant had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in this particular instance." (emphasis added) (quoting Wiggins , 330 S.C. at 545, 500 S.E.2d at 493 ); State v. Starnes , 388 S.C. 590, 599, 698 S.E.2d 604, 609 (2010) (holding there was no evidence to support a voluntary manslaughter jury instruction because there was no evidence that the defendant "was out of control as a result of his fear or was acting under an uncontrollable impulse to do violence" and observing that the record showed only "that Appellant deliberately and intentionally shot [the victims] and that he either shot the men with malice aforethought or in self-defense " (emphases added) ). Therefore, any evidence showing that Appellant's intentional use of deadly force was unjustified, combined with the doctrine of transferred intent, requires this court to affirm the denial of Appellant's directed verdict motion.
Here, there was ample evidence showing that Appellant's intentional use of deadly force was unjustified. Shante Bethel testified that none of the three men whom Appellant claimed were threatening actually said anything threatening; rather, they were merely disrespectful. Nonetheless, immediately after the verbal exchange with Tucker, Woodard, and **31 Samuel, Appellant moved his gun from the inside pocket of his jacket to the outside right pocket and kept his hand in that pocket, indicating his preparation for his later use of the gun to target at least one of the three men. Further, Taqayya White told police that Appellant was the only one who fired a shot that night. Three of Appellant's companions admitted they did not see anyone pull out a weapon or fire a shot at Appellant. A disinterested eyewitness observed a muzzle *193 flash coming from Appellant but did not see anyone else with a gun.
All of this evidence shows that any belief on Appellant's part that he was "in imminent danger of losing his life or sustaining serious bodily injury" was unreasonable. See Dickey , 394 S.C. at 499, 716 S.E.2d at 101 ("If the defense is based upon the defendant's actual belief of imminent danger, a reasonable[,] prudent man of ordinary firmness and courage would have entertained the same belief ...[.]" (quoting Wiggins , 330 S.C. at 545, 500 S.E.2d at 493 ) ). Moreover, after Appellant fired his gun, he fled until he was caught by Officer McLaughlin. This shows that Appellant was free to flee the scene rather than fire the shot that injured Victim. See State v. Douglas , 411 S.C. 307, 318, 768 S.E.2d 232, 239 (Ct. App. 2014) (listing as an element of self-defense, "the defendant had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in this particular instance").
Finally, in a series of telephone calls with Shante Bethel,[10] Appellant reflected on the incident and discussed how to present his case at trial. In one call, he stated that the police had charged him with the wrong offense, i.e., assault and battery of a high and aggravated nature, when he should have been charged with attempted murder. He also told Bethel to testify that he did not fire a shot, which belies his trial testimony that he fired a shot because he was afraid for his life. See Dickey , 394 S.C. at 499, 716 S.E.2d at 101 (listing as one of the elements of self-defense the defendant's actual belief that "he was in imminent danger of losing his life or sustaining serious bodily injury"). Appellant also bragged about how he was going to "hit" the jury with "that innocent **32 look," "get to them," and "have them confused." He then stated, "I got this. I just need y'all to play y'all part." The statements in these phone calls reflect Appellant's memory of his state of mind when he targeted Tucker, Woodard, and Samuel but instead shot Victim. See United States v. Reamer , 589 F.2d 769, 770 (4th Cir. 1978) ("The law is well established that, in a criminal case, evidence of a defendant's attempt to influence a witness to testify regardless of the truth is admissible against him on the issue of criminal intent."); Johnson v. State , 263 S.W.3d 405, 426 (Tex. App. 2008) ("[A]n attempt to tamper with a witness is evidence of 'consciousness of guilt.' " (quoting Wilson v. State , 7 S.W.3d 136, 141 (Tex. Crim. App.1999) ) ). Therefore, the statements contradict Appellant's argument that he was justified in using deadly force to protect himself.
The foregoing evidence shows Appellant's unjustified, specific intent to kill at least one of the three men he encountered. Further, the State showed specific intent as to Victim through the doctrine of transferred intent. In State v. Fennell , our supreme court described the transferred intent doctrine in the following manner:
Some have observed, as the prosecutor did at appellant's trial, that "malice follows the bullet." Such explanations, as well as the term "transferred intent" itself, are somewhat misleading. The defendant's mental state, or mens rea , whatever it may be at the time he allegedly commits a criminal act, is contained within the defendant's brain when he commits the act. That mental state never leaves the defendant's brain; it is not "transferred" from the defendant's brain to another person or place. A more apt description might be that the mental state is like a spotlight emanating from its source-the defendant's mind-to its target-the intended victim.
Nor is that mental state in limited supply. The mental state "spotlight" is not extinguished at the moment a bullet strikes and kills the intended victim, such that there is no mental state left upon which to convict [as to] an unintended victim who also is injured or killed.
340 S.C. 266, 271, 531 S.E.2d 512, 515 (2000).
Appellant cites State v. Hinton , 227 Conn. 301, 630 A.2d 593, 600-02 (1993) in support of the proposition that the **33 transferred intent doctrine does not apply to attempt crimes. *194 However, as the State correctly points out, the Hinton court's analysis was based on its interpretation of Connecticut's statutory scheme for the offenses of attempted murder and assault in the first degree. 630 A.2d at 599-602. The first two subdivisions of Connecticut's assault statute expressly provided for transferred intent whereas there was no such provision in Connecticut's attempted murder statute. The Hinton court relied on the "rule of lenity" commonly used to interpret ambiguous criminal statutes in favor of the defendant: "Under the circumstances of this case, the rule of lenity leads us to conclude that the transferred intent doctrine should not be applied to the crime of attempted murder." 630 A.2d at 602.
The State also points to the following language from our supreme court's opinion in Fennell :
A person who, acting with malice, unleashes a deadly force in an attempt to kill or injure an intended victim should anticipate that the law will require him to answer fully for his deeds when that force kills or injures an unintended victim. Accordingly, we hold that the doctrine of transferred intent may be used to convict a defendant of [assault and battery with intent to kill] when the defendant kills the intended victim and also injures an unintended victim.
340 S.C. at 276, 531 S.E.2d at 517 (emphases added). The court further stated, "Our holding is consistent with the approach taken by other jurisdictions. 'When a defendant contemplates or designs the death of another, the purpose of deterrence is better served by holding that defendant responsible for the knowing or purposeful murder of the unintended as well as the intended victim .' " Id. (emphasis added) (quoting State v. Worlock , 117 N.J. 596, 569 A.2d 1314, 1325 (1990) ). The court also cited Hinton and Ochoa v. State , 115 Nev. 194, 981 P.2d 1201, 1205 (1999) as supporting authorities, noting the application by the Supreme Court of Nevada of the transferred intent doctrine to "all crimes where an unintended victim is harmed as a result of [the] defendant's specific intent to harm an intended victim regardless of whether the intended victim is injured." 340 S.C. at 276, 531 S.E.2d at 518 (emphasis added). The Ochoa court concluded the transferred intent doctrine could be used to prove the defendant committed attempted murder. 981 P.2d at 1205.
**34 Based on the foregoing, the State properly relied on the transferred intent doctrine to show specific intent as to Victim. We affirm the denial of Appellant's directed verdict motion.
II. Mistrial
Appellant also asserts he was entitled to a mistrial based on statements made by the assistant solicitor during her closing argument because the statements violated his due process right to a verdict based on the evidence of his guilt rather than fear.
Near the end of her closing argument, the assistant solicitor made the following comments:
Base your evidence on the credible testimony. I will hang this case on the testimony of Michael Painter, who has no dog in this fight, who is able to describe exactly what happened and what's corroborated by the video. I will hang it on Byron Tucker, who came down here without a subpoena and said what happened. He and his friends didn't have a gun that night. They were shot at. He smiled because he didn't believe it. He was in shock.
And then as Ms. Zmroczek pointed out, [Tucker] walked over to [Victim] and [Victim] gave him a hug because he did something that he did not have to do, which was come down here and testify so that the man who put her in that wheelchair can be held responsible for what he did. Base your decision, base your verdict on that.
And if you don't think that we've done it, if you don't think that Michael Painter was right about the man in the tan outfit firing the gun, then find him not guilty. We will give him back all of his stuff and put him back out on the street .
(emphasis added). The assistant solicitor simultaneously tossed Appellant's gun on top of the clothing he wore on the night of the shooting.
The circuit court sustained Appellant's objection and immediately instructed the jury *195 to "[d]isregard the last statement." After the circuit court completed charging the jury on the law, Appellant made a mistrial motion on the ground that the assistant solicitor's remark about putting Appellant back out on the street was calculated to inflame the passions and **35 prejudices of the jury and violated due process. The circuit court denied the motion, specifically concluding that the circumstances did not rise to the level of "manifest necessity" given his curative instruction and his additional jury instructions.
"The granting or refusing of a motion for a mistrial lies within the sound discretion of the [circuit] court and its ruling will not be disturbed on appeal absent an abuse of discretion amounting to an error of law." Harris , 340 S.C. at 63, 530 S.E.2d at 627-28. "A mistrial should only be granted when absolutely necessary." Id. at 63, 530 S.E.2d at 628 ; see also State v. Inman , 395 S.C. 539, 565, 720 S.E.2d 31, 45 (2011) ("The granting of a motion for a mistrial is an extreme measure that should be taken only when the incident is so grievous the prejudicial effect can be removed in no other way."); State v. Patterson , 337 S.C. 215, 227, 522 S.E.2d 845, 851 (Ct. App. 1999) ("A mistrial should only be granted in cases of manifest necessity and with the greatest caution for very plain and obvious reasons."). "In order to receive a mistrial, the defendant must show error and resulting prejudice." Harris , 340 S.C. at 63, 530 S.E.2d at 628.
We acknowledge that
solicitors must confine their closing remarks to the record and the reasonable inferences that may be drawn therefrom. In keeping their closing arguments within the record, solicitors additionally must tailor their remarks "so as not to appeal to the personal biases of the jury" or "arouse the jurors' passions or prejudices."
Tappeiner v. State , 416 S.C. 239, 250, 785 S.E.2d 471, 477 (2016) (citation omitted) (quoting Von Dohlen v. State , 360 S.C. 598, 609, 602 S.E.2d 738, 744 (2004) ). Nonetheless, an "[i]mproper closing argument does not automatically require reversal of a conviction." State v. Carlson , 363 S.C. 586, 607, 611 S.E.2d 283, 293 (Ct. App. 2005). "The appropriateness of a solicitor's closing argument and the decision whether to grant a defendant's motion for a mistrial are matters within the trial judge's discretion that ordinarily will not be disturbed on appeal." Id. at 607, 611 S.E.2d at 293-94.
Moreover, "[o]nce the trial judge has allowed the argument to stand ... the defendant must bear the burden of **36 demonstrating that the argument in effect denied him a fair determination of his guilt or innocence." State v. Linder , 276 S.C. 304, 312, 278 S.E.2d 335, 339 (1981). "On appeal, this [c]ourt will review the alleged impropriety of argument in the context of the entire record." Id. "A new trial will not be granted unless the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." State v. Huggins , 325 S.C. 103, 107, 481 S.E.2d 114, 116 (1997).
Here, Appellant maintains the assistant solicitor's remark "asked the jury to focus on the irrelevant factor of [A]ppellant's future dangerousness, not his guilt or innocence."[11] Specifically, Appellant asserts the assistant solicitor "capitalized not only on the jury's general fear of gangs, but on their specific fears for their own safety[,] which they expressed twice in writing to the [circuit court]."[12] Appellant is referring to two notes sent by the jury to the circuit court. Roughly mid-way through the State's case, the jury sent the following note to the circuit court:
*196 We are all concerned about our safety. It is our understanding that someone in a red shirt took a picture of all of us in the courtroom yesterday. We are not discussing the case, just concerned about our safety. We would like to discuss this with the judge when he has some time. Thanks,
Jurors
After meeting with the jury, the circuit court advised counsel for the State and Appellant of the following:
**37 Okay. I questioned the jury about the note that they sent concerning someone taking a picture. My question to them was how have you learned about this more than anything, and they-a couple of them said they thought they saw somebody take a picture of them and then they heard me say no more cell phones in the courtroom.
I told them that I said no more cell phones in the courtroom because I was aware that somebody had taken a picture of me and that's when I ended the cell phones in the courtroom except for law enforcement, media[,] and lawyers.
I said is anybody concerned about their safety, and they said no. So they're fine.
After the circuit court provided jury instructions and the jury exited the courtroom, they sent a second note, along with a request for a written copy of the jury instructions, to the circuit court: "There have been concerns expressed by the group about safety [after the] conclusion of this trial." The circuit court responded in writing at the bottom of the second note: "We will ensure your safety at the conclusion of the trial. Thank you-REH Written [with] the consent of the attorneys REH[.]"
Similar to previous inappropriate conduct in this particular judicial circuit,[13] the assistant solicitor in the present case undoubtedly pushed the boundaries that officers of the court **38 must respect. She improperly alluded to Appellant's future dangerousness, which is irrelevant to his guilt of the charged offenses, in an attempt to appeal to the jurors' sense of fear. See State v. White , 246 S.C. 502, 504, 507, 144 S.E.2d 481-83 (1965) (holding that the State's argument, "Let him go, let him come back to Williamsburg County. Let him come in your wife's bedroom or your mother or daughters, any of them, what would you do?" injected matters outside the record into the case and "calculated to take from the trial the necessary element of impartiality"); Martin v. Estelle , 546 F.2d 177, 179 (5th Cir. 1977) (observing that the continual references to "highly inflammatory evidence," combined with the prosecution's argument "that [the] appellant would be 'back on the streets' if found incompetent to stand trial" supported the appellant's "position that he was denied a full, fair, and meaningful competency trial"); Wingate v. Wainwright , 464 F.2d 209, 215 (5th Cir. 1972) (holding that the prejudicial nature of evidence of a habeas petitioner's prior alleged robberies for which he was tried and acquitted was "quickened by" the prosecution's improper argument, "I am asking you not to allow this man to go back on the street and to redo those things that he has done"). In fact, the State conceded during oral arguments before this court that the assistant solicitor's comments were inappropriate.
We also agree with Appellant that the words, "put him back out on the street" were misleading given his federal conviction and *197 sentence. Nevertheless, the improper remark was cured by the circuit court's instruction to disregard it in combination with his repeated admonitions before and after the State's closing argument that the jurors were required by their oath to disregard any statement when instructed to do so and that the arguments of the attorneys did not constitute evidence. See State v. Greene , 330 S.C. 551, 561, 499 S.E.2d 817, 822 (Ct. App. 1997) ("An error is deemed to be cured if a curative instruction is given."). Notably, none of the opinions cited by Appellant in support of his argument for a mistrial involved a curative instruction from the presiding judge. In fact, two of these opinions specifically state that no curative instruction was given to the jury. See United States v. Johnson , 968 F.2d 768, 772 (8th Cir. 1992) ; Bigner v. State , 822 So.2d 342, 352 (Miss. Ct. App. 2002). **39 Further, the circuit court responded to the jurors' written expression of fear by advising them the court would ensure their safety at the trial's conclusion. Moreover, to the extent that the improper remark may not have been cured, we agree with the circuit court's statement that despite its traditional prohibition against evidence relating to gang activity, Appellant introduced "the gang issue" into the case so that it "was always in front of the jury without any objection from [Appellant] at all." We acknowledge Appellant's argument, "[a]ggressive behavior by the rival gang members ... was necessary for [A]ppellant to explain his actions and to establish his self-defense case." However, in all fairness, we cannot ignore the contribution that this trial strategy likely made to the sense of fear the jurors expressed in their notes to the circuit court. Therefore, the assistant solicitor's improper remarks did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." Huggins , 325 S.C. at 107, 481 S.E.2d at 116. The circuit court properly exercised its discretion in denying Appellant's mistrial motion.
III. Jury Instruction on Felony Murder Rule
Appellant argues the circuit court erred by instructing the jurors they could infer malice based on the "felony murder rule" because the underlying felonies were not inherently dangerous and involved merely possession of a firearm.
A. Nature of the Underlying Felony
In Norris , our supreme court set forth the following as an example of a proper jury instruction on the felony murder rule:
The law says if one intentionally kills another during the commission of a felony, the implication of malice may arise. If facts are proved beyond a reasonable doubt, sufficient to raise an inference of malice to your satisfaction, this inference would be simply an evidentiary fact to be taken into consideration by you, the jury, along with other evidence in the case, and you may give it such weight as you determine it should receive.
**40 285 S.C. at 92, 328 S.E.2d at 343.[14]
Appellant argues that illegally possessing a firearm is a "status" crime that does not provide a sufficient basis to charge the felony murder rule. Appellant cites Gore v. Leeke , 261 S.C. 308, 316, 199 S.E.2d 755, 758 (1973) for the proposition that the felony murder rule should not be charged to the jury unless the underlying felony is inherently *198 dangerous. Appellant also cites Gore for the proposition that the felony murder rule should not apply to crimes classified as malum prohibitum , which means "[a]n act that is a crime merely because it is prohibited by statute, although the act itself is not necessarily immoral,"[15] as opposed to offenses considered" "malum in se ," which means "[a] crime or an act that is inherently immoral, such as murder, arson, or rape."[16] Appellant characterizes his illegal gun possession at the time he shot Victim as malum prohibitum .
First, contrary to Appellant's assertion, the Gore court did not adopt the following language: "[T]here is no room for the logical application of [the felony murder rule] where the felony committed was not an inherently dangerous one." Rather, the court presented this language as part of Mr. Gore's argument **41 in that case. 261 S.C. at 316, 199 S.E.2d at 758. In fact, the court observed, in dictum,
The weight of authority, in other jurisdictions where the question has arisen, appears to be to the effect that both the nature of the felony itself and the circumstances of its commission are to be considered in determining whether a felony is foreseeably dangerous so as to properly invoke the application of the felony-murder rule.
Id. at 317, 199 S.E.2d at 758. Nonetheless, the court declined to adopt a rule for application beyond the facts of the case before it and merely held that Gore's conviction under the felony murder rule "was fully justified" under the circumstances of the case. Id. at 318, 199 S.E.2d at 759.
Here, the circuit court gave the following explanation for its decision to instruct the jury on the felony murder rule:
I believe that the carrying of a firearm in these conditions with [Appellant's] criminal history put everybody in an extreme risk of danger that was present in the area that night. There was no doubt based upon the evidence submitted and based upon the defense attorney's opening statement and his conviction in federal court that he was, at least, committing a federal crime and potentially committing, at least, two [s]tate felonies while carrying the firearm. So the difference in this situation is it's not like we have somebody in the community lawfully carrying a firearm [who] chooses to, you know, use it or to defend themselves. This is an individual who based upon his prior criminal history would not be allowed to carry a firearm period in state court or in federal court. And so I-you know, I think the unlawful carrying of a pistol by a convicted felon in our community in a situation such as a crowd in Five Points and in a situation where, according to his own testimony, he knew was violent , he had been beaten up and assaulted[,] rises to a different level, and I will charge the version of felony murder.
(emphasis added).
In other words, the circuit court concluded the circumstances of the present case made Appellant's prohibited possession of a weapon foreseeably dangerous. This conclusion is supported by the record and by the Gore court's approach to **42 the same question, i.e., the circumstances of this specific case justified the circuit court's instruction on the felony murder rule.
Further, even if Gore may be interpreted to limit the felony murder rule to malum in se offenses, we disagree with Appellant's characterization of his illegal gun possession at the time he shot Victim as malum prohibitum . This was not a case of an otherwise law-abiding citizen carrying a concealed weapon without the required permit. Appellant was prohibited from possessing a weapon because he had previously been convicted of a "violent felony" and a "crime of violence." Through the very prohibition of gun possession by such persons, the legislature has recognized the inherent danger involved. See S.C. Code Ann. § 16-23-30(A)(1) (2015) ("It is unlawful for a person to knowingly sell, offer to sell, deliver, lease, rent, barter, exchange, or transport for sale into this State any handgun to ... a person who has been convicted of a crime of violence in any court of the United States, the several states, commonwealths, *199 territories, possessions, or the District of Columbia...."); S.C. Code Ann. § 16-23-500(A) (2015) ("It is unlawful for a person who has been convicted of a violent crime, as defined by Section 16-1-60, that is classified as a felony offense, to possess a firearm or ammunition within this State.").
Moreover, any error in giving a jury instruction on this rule was harmless beyond a reasonable doubt, which we will address in more detail in Part III(D) below.
B. Violation of Norris
Appellant also argues the circuit court's felony murder rule instruction was inadequate because it did not employ the exact language used in the example given by our supreme court in Norris. We disagree.
Contrary to Appellant's argument, the Norris court did not indicate it was requiring circuit courts to use the model charge set forth in its opinion. In fact, the court found no error in the circuit court's instructions in that case. Norris , 285 S.C. at 91-92, 328 S.E.2d at 342.
In the present case, the circuit court gave the following instruction on the felony murder rule:
**43 Now, the law also allows you to infer malice if you conclude that the attempted murder was a proximate direct result of the commission of a felony. And for that regard, two of the gun charges, possession of a weapon by a person being convicted of a crime of violence and possession of a weapon by a person being convicted of a violent felony would be felonies under our law. You can imply that malice existed if a person in the commission of a felony at the time of the attempted fatal blow, if one attempts to kill another during the commission of a felony, the inference of malice may arise.
(emphases added). The circuit court also gave the following instructions on the role of inferences in the evidence presented:
[T]he law says that criminal intent may be inferred from the circumstances shown to have existed. This is how you make a determination of whether or not the element requiring intent was present. It is not necessary to establish intent by direct and positive evidence, but intent may be established by inference in the same way as any other fact by taking into consideration the acts of the parties and all the facts and circumstances of the case .
(emphasis added). As to malice, the circuit court instructed the jury,
Malice aforethought may be expressed or implied. These terms expressed and inferred-excuse me, inferred, not implied. These terms expressed and inferred do not mean different kinds of malice, but merely the manner in which the malice may be shown to exist. That is either by direct evidence or by inference from the facts and the circumstances [that] are proved . Expressed malice is shown when a person speaks words [that] express hatred or ill will for another or when the person prepared beforehand to do the act [that] was later accomplished. For example, lying in wait for a person or any other acts of preparation going to show that the deed was within the Defendant's mind would be expressed malice. Malice may also be inferred from conduct showing a total disregard for human life. If facts are proved beyond a reasonable doubt sufficient to raise an inference of malice to your satisfaction, this inference would simply be an evidentiary fact to be considered by **44 you, the jury, along with the other evidence in the case . And you may give it the weight and credibility-may give it the weight you decide it should receive.
(emphases added).
Therefore, the circuit court's jury instructions as a whole adequately informed the jury that Appellant's commission of a felony during the alleged attempted killing did not require the jury to find malice but merely allowed them to infer malice. Further, even if the Norris court had made its model instruction mandatory, the circuit court's instructions in the present case, as a whole, covered all of the information set forth in the Norris example. See State v. Marin , 415 S.C. 475, 482, 783 S.E.2d 808, 812 (2016) ("In reviewing jury charges for error, we must consider the court's jury charge as a whole in light of the evidence and issues presented at trial."
*200 (quoting State v. Brandt , 393 S.C. 526, 549, 713 S.E.2d 591, 603 (2011) ) ); id. ("The substance of the law is what must be instructed to the jury, not any particular verbiage." (quoting State v. Smith , 315 S.C. 547, 554, 446 S.E.2d 411, 415 (1994) ) ).
Based on the foregoing, the circuit court's felony murder rule instruction did not violate Norris.
C. Violation of Belcher
Appellant asserts there was evidence he acted in self-defense, and thus, the circuit court's application of the felony murder rule to his weapon possession offenses violated Belcher , which prohibits a jury instruction allowing the inference of malice from the use of a deadly weapon when there is evidence "that would reduce, mitigate, excuse[,] or justify the killing (or the alleged assault and battery with intent to kill)." 385 S.C. at 610, 685 S.E.2d at 809. Appellant argues that if malice may not be inferred from the use of a deadly weapon, then surely it may not be inferred from mere possession of a deadly weapon.
The State argues Appellant did not preserve his Belcher argument for review because he did not raise it at trial. We agree.[17] See State v. Freiburger , 366 S.C. 125, 135, 620 S.E.2d 737, 742 (2005) ("[I]f asserted errors are not presented to the **45 [circuit c]ourt, the question cannot be raised for the first time on appeal.").[18]
D. Harmless Error
The State argues any error in giving the felony murder rule instruction was harmless beyond a reasonable doubt because there was other evidence of Appellant's malice. See State v. Middleton , 407 S.C. 312, 317, 755 S.E.2d 432, 435 (2014) (holding the circuit court's error in refusing to instruct the jury on a lesser-included offense was "harmless beyond a reasonable doubt"); id. ("When considering whether an error with respect to a jury instruction was harmless, we must 'determine beyond a reasonable doubt that the error complained of did not contribute to the verdict.' " (quoting State v. Kerr , 330 S.C. 132, 144-45, 498 S.E.2d 212, 218 (Ct.App.1998) ) ). We agree.
" 'In making a harmless error analysis, [the appellate court's] inquiry is not what the verdict would have been had the jury been given the correct charge, but whether the erroneous charge contributed to the verdict rendered.' Thus, whether or not the error was harmless is a fact-intensive inquiry." Middleton , 407 S.C. at 317, 755 S.E.2d at 435 (citation omitted) (quoting Kerr , 330 S.C. at 145, 498 S.E.2d at 218 ). The appellate court "must review the facts the jury heard and weigh those facts against the erroneous jury charge to determine what effect, if any, it had on the verdict." Kerr , 330 S.C. at 145, 498 S.E.2d at 218.
**46 In the present case, the most damning evidence of Appellant's express malice was uncontested and compelling. As previously stated, immediately after the exchange with Tucker, Woodard, and Samuel, Appellant moved his gun from the inside pocket of his jacket to the outside right pocket and kept his hand in that pocket. This shows Appellant's preparation for his later use of the gun to target at least one of the three men. Additionally, no one could testify to seeing any of the three men pull out a weapon or fire a shot at Appellant.
*201 This evidence shows that any belief on Appellant's part that he was "in imminent danger of losing his life or sustaining serious bodily injury" was unreasonable. See Dickey , 394 S.C. at 499, 716 S.E.2d at 101 ("If the defense is based upon the defendant's actual belief of imminent danger, a reasonable[,] prudent man of ordinary firmness and courage would have entertained the same belief ...[.]" (quoting Wiggins , 330 S.C. at 545, 500 S.E.2d at 493 ) ). Moreover, Appellant was free to flee the scene rather than fire the shot that injured Victim. See Douglas , 411 S.C. at 318, 768 S.E.2d at 239 (listing as an element of self-defense, "the defendant had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in this particular instance").
Finally, in telephone calls to Shante Bethel, Appellant stated that the police had charged him with the wrong offense, i.e., assault and battery of a high and aggravated nature, when he should have been charged with attempted murder. He also told Bethel to testify that he did not fire a shot, which belies his trial testimony that he fired a shot because he was afraid for his life. See Dickey , 394 S.C. at 499, 716 S.E.2d at 101 (listing as one of the elements of self-defense the defendant's actual belief that "he was in imminent danger of losing his life or sustaining serious bodily injury"). Additionally, he bragged about how he was going to "hit" the jury with "that innocent look," "get to them," and "have them confused." He then stated, "I got this. I just need y'all to play y'all part." These statements constitute compelling evidence of Appellant's consciousness of guilt. See Reamer , 589 F.2d at 770 ("The law is well established that, in a criminal case, evidence of a defendant's attempt to influence a witness to testify regardless of the truth is admissible against him on the issue of criminal intent."); Johnson , 263 S.W.3d at 426 ("[A]n attempt to tamper **47 with a witness is evidence of 'consciousness of guilt.' " (quoting Wilson , 7 S.W.3d at 141 ) ).
These undisputed facts belie Appellant's claim that he was acting in self-defense and, instead, show express malice and his specific intent to kill at least one of the three men he encountered. Moreover, the State showed specific intent as to Victim through the doctrine of transferred intent. Given the candid and compelling nature of the foregoing evidence, we conclude that beyond any reasonable doubt, the felony murder rule instruction made no contribution to the verdict and any error in giving it was harmless. See Young , 420 S.C. at 628, 803 S.E.2d at 899 ("The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." (quoting Delaware v. Van Arsdall , 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) ) ).
CONCLUSION
Accordingly, we affirm Appellant's attempted murder conviction.
HUFF and MCDONALD, JJ., concur.

We address the issues in a different order from that in Appellant's brief.

Byron Tucker told the police that Woodard was in a gang that rivaled the Bloods. However, Captain Vincent Goggins, the supervisor of the Midlands Gang Task Force, testified he did not find Woodard, Tucker, or Daquan Samuel in the Task Force's "gang database," but he did find Appellant in the database as a "self-admitted" Blood gang member.

Appellant testified he detected that the three men knew he was a gang member: "They said slob, so I already knew what the problem was, so they already figured out I was a gang member." Upon prompting by his counsel, he stated he was not a gang member because he was "never initially beaten in."

Asia Bethel testified she saw one of the three men pulling up his shirt and exposing a gun, but she turned away and did not see him pull the gun out. Shante Bethel testified she saw one of the men put his hand in his pants. She also turned away and then heard gunshots. White testified she saw no one, other than Appellant, with a gun that night.

Although Appellant's Notice of Appeal references all of his convictions and sentences, his appellate brief seeks reversal of only his attempted murder conviction.

285 S.C. 86, 92, 328 S.E.2d 339, 343 (1985) (setting forth an example of a proper jury instruction on the felony murder rule), overruled on other grounds by State v. Belcher , 385 S.C. 597, 685 S.E.2d 802 (2009) and State v. Torrence , 305 S.C. 45, 406 S.E.2d 315 (1991).

385 S.C. 597, 610, 685 S.E.2d 802, 809 (2009) ("[T]he 'use of a deadly weapon' implied malice instruction has no place in a murder (or assault and battery with intent to kill) prosecution where evidence is presented that would reduce, mitigate, excuse[,] or justify the killing (or the alleged assault and battery with intent to kill).").

The Kinard court noted that our supreme court's opinion in State v. Harris , 340 S.C. 59, 64, 530 S.E.2d 626, 628 (2000) found that the definition of 'malice aforethought' in Black's Law Dictionary "does not vary in a meaningful way from a proper jury instruction." 373 S.C. at 504 n.3, 646 S.E.2d at 169 n.3.

The court affirmed, as modified, this court's opinion, filed on April 22, 2015, holding the State must show that a defendant charged with attempted murder had the specific intent to commit murder. 412 S.C. 403, 407-11, 772 S.E.2d 189, 191-93 (Ct. App. 2015). The supreme court also expanded the analysis to explain that our legislature "created the offense of attempted murder by purposefully adding the language 'with intent to kill' to 'malice aforethought, either express or implied' to require a higher level of mens rea for attempted murder than that of murder." 422 S.C. at 61, 810 S.E.2d at 25. In the present case, the circuit court instructed the jury that attempted murder "requires the specific intent to kill."

Appellant made these calls while he was incarcerated awaiting trial, and the calls were recorded.

In support of this assertion, Appellant cites the following dictum from Justice Blackmun's plurality opinion in Simmons v. South Carolina :
Arguments relating to a defendant's future dangerousness ordinarily would be inappropriate at the guilt phase of a trial, as the jury is not free to convict a defendant simply because he poses a future danger; nor is a defendant's future dangerousness likely relevant to the question whether each element of an alleged offense has been proved beyond a reasonable doubt.
512 U.S. 154, 163, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).

Appellant also argues the remark in question was inaccurate and misleading because "the State knew that [A]ppellant had already been convicted and sentenced in federal court and under no circumstances would be 'back on the streets.' "

See State v. Anderson , 413 S.C. 212, 219-20, 776 S.E.2d 76, 79-80 (2015) (holding the circuit court erred in qualifying a witness as an expert in child abuse assessment and in forensic interviewing and the prejudice was "overwhelming" because "the solicitor and [the witness] repeatedly pushed the boundaries of the parties' common understanding of the permissible limits of [the witness's] trial testimony" with improper vouching and the volume of the solicitor's voice at bench hearings was inappropriate); State v. Young , 420 S.C. 608, 623, 803 S.E.2d 888, 896 (Ct. App. 2017) (holding the circuit court erred in admitting a co-defendant's letter to his mother without conducting the examination required by Rule 804(b)(3), SCRE, for admitting a purported statement against penal interest because the "portions of the letter that did not plainly inculpate [the co-defendant] were rank hearsay inadmissible against" the defendant); id. at 629, 803 S.E.2d at 899 ("We remain concerned-not to mention perplexed-by the State's use of evidence the [United States] Supreme Court forbade a generation ago in Williamson [v. United States , 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) ], and in a manner condemned a generation before that in Bruton [v. United States , 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) ].").

We acknowledge that the specific intent requirement for attempted murder may preclude the application of the felony murder rule in attempted murder cases given that the rule allows for the implication of malice. See King , 422 S.C. at 57, 810 S.E.2d at 23 ("One cannot be guilty of attempted murder by implied malice because implied malice does not encompass the essential specific intent to kill." (quoting Keys , 766 P.2d at 273 ) ). Yet, the King court recognized that the concept of implied malice still lingers in the language of section 16-3-29, which modifies the term "malice aforethought" with the phrase "express or implied." § 16-3-29 ; see King , 422 S.C. at 64 n.5, 810 S.E.2d at 27 n.5 ("[W]e would respectfully suggest to the General Assembly to re-evaluate the language following 'malice aforethought' as the inclusion of the word 'implied' in section 16-3-29 is arguably inconsistent with a specific-intent crime."); id. (declining to address whether this court "erred in summarily affirming the trial judge's decision to instruct the jury that malice may be inferred from the use of deadly weapon" after acknowledging that the issue was related to the specific intent issue). In any event, we need not resolve this precise question as it was neither presented to the circuit court nor argued in Appellant's brief.

Malum prohibitum , Black's Law Dictionary (9th ed. 2009).

Malum in se , Black's Law Dictionary (9th ed. 2009).

At oral argument, Appellant attempted to rebut the State's preservation argument by contending that a party does not have to cite the name of a case supporting the party's asserted ground for an objection in order to preserve the ground for appellate review. This court is well aware of the specificity required to preserve an argument for review. See State v. Geer , 391 S.C. 179, 191, 705 S.E.2d 441, 448 (Ct. App. 2010) ("A party need not use the exact name of a legal doctrine in order to preserve it, but it must be clear that the argument has been presented on that ground ." (emphasis added) (quoting State v. Dunbar , 356 S.C. 138, 142, 587 S.E.2d 691, 694 (2003) ) ). At trial, Appellant's asserted grounds for objecting to the jury instruction on the felony murder rule never included an argument that his purported evidence of self-defense precluded the circuit court from giving the instruction.

Likewise, Appellant's argument that the felony murder rule instruction "negated the jury's duty to determine whether the State disproved self-defense beyond a reasonable doubt" was not presented to the circuit court. Therefore, it is not preserved for review.