# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

James Caleb Williams, Appellant.

Appellate Case No. 2017-001601

―――――――――

Appeal From Sumter County
Howard P. King, Circuit Court Judge

―――――――――

Opinion No. 5835
Heard May 27, 2021 – Filed July 14, 2021

―――――――――

## REVERSED AND REMANDED

―――――――――

Chief Appellate Defender Robert Michael Dudek, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant
Attorney General William Frederick Schumacher, IV,
both of Columbia, and Third Circuit Solicitor Ernest
Adolphus Finney, III, of Sumter, all for Respondent.

―――――――――

**MCDONALD, J.:** James Caleb Williams appeals his convictions for attempted
murder and possession of a weapon during the commission of a violent crime,
arguing the circuit court erred in denying his motion for a directed verdict because
no direct or substantial circumstantial evidence supports a finding that Williams
had a specific intent to kill the victim. We find the doctrine of transferred intent

inapplicable to this charge of attempted murder; thus, we reverse Williams's convictions.[1]

**Facts and Procedural History**

In the early morning hours of May 2, 2015, Corporal Randy Jones of the Sumter Police Department (SPD) was dispatched to a shooting outside Club Cream in Sumter. In the club parking lot, Corporal Jones found Ashley R., a fifteen-year-old female who had been shot in the leg. Law enforcement subsequently recovered six shell casings and a black Springfield model XD .40 Smith and Wesson from the parking lot area.

On March 17, 2016, the Sumter County Grand Jury indicted Williams for two counts of attempted murder and one count of possession of a weapon during the commission of a violent crime. Williams pled not guilty, and his jury trial began on July 17, 2017.

Chelsea Rogers reluctantly testified that on May 2, 2015, she went to Club Cream for a teen party. She explained a "teen party" is "where a lot of teens get together, you know, have fun, but something bad always ends up happening." Rogers and her friends arrived around 11:30 p.m. or 12:00 a.m. and were "dancing and having fun" when she saw "something going on" on the other side of the club; however, when nothing materialized, the group went back to dancing.

Sometime between 1:00 and 2:00 a.m., Rogers left the club to go home. Her then-boyfriend, Malik Myers, exited a few minutes later. Rogers recalled, "After that, we [were] walking to the car and I told [Myers] to come on, let's go. When we got over there to the car, I heard a gunshot." At that point, Myers "ran over there—to where his friends were, I guess, and that's when I—I heard another gunshot, and then I heard another one come back from right where everybody was at." She further stated, "I didn't know if [Myers] had [a gun] or not, but I did not see him with one."

Ashley R. arrived at the party between 10:00 and 11:00 p.m., and was leaving Club Cream as it closed at 2:00 a.m. When Ashley R. reached the parking lot, she heard "fight, gun, shooting. That's when—by the time I could duck down, [it felt] like a

---

[1] With respect to Williams's conviction for possession of a weapon during the commission of a violent crime, we reverse and remand.

bee sting. I touched my leg, and started to panic."[2] She heard gunshots and saw Myers, whom she had met earlier that day. Ashley R. testified, "I [saw] him shoot after—I [saw] the other like two—two shots before he [shot], that's when I ducked down." After initially answering that she did not see Myers shoot first, Ashley R. explained, "I [saw Myers] with a gun, that's when I heard the—before he [shot], I heard like two more, two or three gunshots before he [shot]." On the night of the incident, Ashley R. told law enforcement she was shot by an "unknown black man" and recalled at trial that she did not really know Myers until he "came to me and apologized to me afterwards. That's how I [got] to know him."

On cross-examination, Ashley R. admitted that in her written statement to police, she identified Myers as the man who started the shooting and her statement did not include that she heard shots before Myers fired his weapon. Defense counsel asked her on cross-examination:

> Q: You can't testify today who was shooting the shots, who was actually shooting, can you?
>
> A: Not the first two shots.
>
> . . . .
>
> Q: And the shot that hit you, you pretty sure who shot you?
>
> A: Like when it first happened?
>
> Q: Uh-huh.
>
> A: Since I [saw Myers], I thought he shot me, but that's when—because after that, because he came to me, he apologized—
>
> . . .
>
> Q: Why would he apologize if he did not shoot you? What is he apologizing for?

---

[2] Ashley R. estimated four or five shots were fired before she realized she had been shot in the leg and was bleeding.

A:  I'm not sure.

Q:  He apologized for shooting you?

A:  I'm not sure.  After he said that, I said, "You good.
I'm not mad at you."  He said, "Okay."

Q:  Okay.  But you don't know what he was apologizing
for?

A:  No sir.

Myers pled guilty to one count of assault and battery of a high and aggravated nature (ABHAN) for his involvement in the Club Cream incident.  Despite his prior written statement to the police indicating he and Williams "had beef" in the past, Myers testified at trial:  "Man, I just came from a hospital, man.  I wasn't thinking right when I was writing my statement. . . . [I]t wasn't no altercation.  It was just some words."  Myers also contradicted his written statement—in which Myers claimed Williams shot him in the leg—by denying Williams made any hand gestures toward him while inside the club.  Myers admitted he had his .38 revolver that night "because anything could have happened after the club," and repeatedly denied any knowledge of whether Williams was the person who shot him.  Myers testified, " I didn't know whether James Williams was shooting or not.  I'm just saying—I—you telling me—I just know I got shot.  You're saying he's the shooter. I'm telling you[,] I didn't know he was shooting.  That's what this statement said."

At the conclusion of the State's case, Williams moved for a directed verdict, arguing neither Ashley R. nor Myers could identify their shooter and the State's expert could not conclusively connect the bullet removed from Ashley R.'s leg with Williams's weapon.[3]  The circuit court denied the motion, finding "there is

---

[3] SLED ballistics and firearms agent Michelle Eichenmiller testified that in her opinion, cartridge cases found at the scene "were fired by [the Springfield model XD .40 Smith and Wesson]."  As to the bullet removed from Ashley R.'s leg, Eichenmiller "didn't see enough individual characteristics to form an opinion as [to whether] it was fired by that firearm."  However, she noted "both the Springfield XD and the bullet [she] received were six right, conventional rifling with approximately the same land and groove width."  The bullet removed from the victim's leg "could have been [fired from] a 10-millimeter firearm or a 40 S&W."

evidence in the record, both direct and circumstantial that would support the charges."  The circuit court explained its "recollection of the testimony [was] that the defendant, Mr. Williams, fired first and was firing at both Mr. Malik Myers and that by transferred intent, at the other victim in this case."

Williams testified in his own defense.  He arrived at the club alone around 11:00 p.m. and, at some point during the party, Myers bumped into him.  Williams explained, "We didn't say nothing to each other or anything, but I already knew like something was going to happen, like once I left.  That's why I was already in my car getting ready to go ahead and leave."  Williams knew something was going to happen with Myers "[b]ecause we had problems since we [were] in middle school, like we always had words.  But I [knew] it was probably going to end up coming to something one day."

Williams stated he was walking to his car when he saw Myers approaching.  As Myers had a gun and began shooting at him, Williams "started shooting, and that's when I ran off when I [saw] the security guard coming, and I threw my gun under—up under the tree."  Williams testified, "But when I was shooting, I was shooting into the back of my car so he would think I was shooting back at my car."  Williams claimed he shot into the back of his own car so that Myers "would have thought I was shooting at him, and he would have been—he would have tried to run off."  However, Myers did not run.  Instead, Myers "came close to shooting [Williams]" and shot Qawiyy McFadden in the ear.  Williams then left the parking lot to drive McFadden to the hospital.[4]

On cross-examination, Williams admitted he had a black .40 caliber Springfield with him in the parking lot and that he fired shots into his own car in an effort to scare Myers.  He found five bullet casings on top of his car, and regarding the sixth, testified, "I probably shot it into the ground."  Williams reiterated that Myers

---

Eichenmiller explained, "It's a little bit larger than a .38.  Depending on the firearm, I have seen some that have worn barrels that it could have been fired from, but not usually."  On cross-examination, Eichenmiller admitted a Glock 22 also fires a .40 bullet.

[4] Myers, who was initially charged with two counts of attempted murder, pled guilty to one count of ABHAN for shooting McFadden in the left ear.  McFadden testified Myers's shot hit him from the front, and there is no evidence in the record to the contrary.

shot at him first and claimed there were more than two shooters in the parking lot.[5] He testified he did not shoot Ashley R., and he did not intend to shoot anyone. McFadden was sitting in Williams's car when he saw "everybody coming out the club." Williams's car was backed into the parking space, with the front of the car facing the club. McFadden testified, "I got out the car to see what was the next move for the night. And then mix-up—the shots starting going off when I was out of the club. I [saw Williams] go like towards the back of his car and by maybe the first five shots, I was already hit." On cross-examination, McFadden admitted he did not know if Williams did any of the shooting, nor did he know who fired the first shot.

At the end of his case, Williams renewed his motion for a directed verdict. The circuit court denied the motion, finding, "there is evidence in the record by which the jury could conclude that the offenses occurred . . . and the believability of those witnesses will be a matter for the jury to determine."

The jury found Williams guilty of the attempted murder of Ashley R., but not guilty of the attempted murder of Myers. The jury also found Williams guilty of possession of a weapon during the commission of a violent crime. The circuit court sentenced Williams on the attempted murder conviction to fifteen years' imprisonment, suspended upon the service of ten years, and five years' probation. As to his conviction for possession of a weapon during the commission of a violent crime, the court sentenced Williams to a concurrent five years' imprisonment.

**Standard of Review**

"In ruling on a motion for directed verdict in a criminal case, a trial court must view the evidence in the light most favorable to the State." *State v. James*, 362 S.C. 557, 561, 608 S.E.2d 455, 457 (Ct. App. 2004). "The trial court is concerned with the existence or nonexistence of evidence, not its weight." *Id.* "The accused is entitled to a directed verdict when the State fails to present evidence on a material element of the offense charged." *State v. Brannon*, 388 S.C. 498, 503, 697 S.E.2d 593, 596 (2010).

---

[5] SPD crime scene investigator Amanda Snapp testified during the defense's case. Based on her examination, "it appeared that there [were] five bullet holes in the roof line of the vehicle." Snapp further stated "there [were] no bullet holes in the front of [Williams's] vehicle, so I can only imagine that they came from the back of the vehicle, most likely."

**Law and Analysis**

Williams argues the circuit court erred in failing to direct a verdict on the attempted murder charge because the State failed to present any direct or substantial circumstantial evidence that he had the specific intent to kill anyone—either Myers or Ashley R. He asserts the circuit court erroneously applied the doctrine of transferred intent because the offense of attempted murder requires a specific intent to commit murder. We agree.[6]

---

[6] Our dissenting colleague urges us to decline to consider the applicability of the doctrine of transferred intent to this charge of attempted murder. The dissent would find the matter unpreserved for our review on the basis that the trial court "was not given the opportunity to consider all the relevant facts, law, and argument and rule on this issue." (Huff, J., dissenting). Our review of the record, however, reveals the trial judge had such opportunity when defense counsel moved for a directed verdict on the basis that the State had not met its burden of proof beyond a reasonable doubt. In response, the State argued, "And also just specifically because he [Williams] was not shooting directly at Ashley, I would point out that we're proceeding under transferred intent and we do believe that he was firing his gun with malice and the bullet struck Ashley R." The circuit court ruled immediately−giving defense counsel no chance to reply to the State's argument−citing Rule 19 of the South Carolina Rules of Criminal Procedure and recollecting its understanding of the testimony that "the defendant, Mr. Williams, fired and was firing at both Mr. Malik Myers and that by transferred intent, at the other victim in this case."

While we acknowledge the defense could have better articulated the precise question of transferred intent at trial, like the dissent, we recognize "a party need not use the exact name of a legal doctrine in order to preserve it, but it must be clear that the argument has been presented on that ground." *State v. Carmack*, 388 S.C. 190, 200–01, 694 S.E.2d 224, 229 (Ct. App. 2010) (quoting *State v. Dunbar*, 356 S.C. 138,142, 587 S.E.2d 691, 94 (2003)). Notably, the State did not raise preservation as an issue in its respondent's brief. *See I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 418 n.6, 526 S.E.2d 716, 722 n.6 (2000) ("Under present rules, the appellant receives notice of the respondent's additional sustaining grounds through the respondent's brief. The appellant may address those additional grounds in a reply brief." (citing Rule 208(a)(3), SCACR.")); *Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 332–33, 730 S.E.2d 282, 287 (2012) ("When the opposing party does not raise a preservation issue on appeal, courts are not precluded from finding the issue unpreserved if the error is clear.

In *State v. King*, our supreme court affirmed this court's opinion that "the Legislature intended to require the State to prove specific intent to commit murder as an element of attempted murder." 422 S.C. 47, 55, 810 S.E.2d 18, 22 (2017) (quoting *State v. King*, 412 S.C. 403, 411, 772 S.E.2d 189, 193 (Ct. App. 2015)); S.C. Code Ann. § 16-3-29 (2015) ("A person who, with intent to kill, attempts to kill another person with malice aforethought, either expressed or implied, commits the offense of attempted murder."). The supreme court explained, "Because the phrase 'with intent to kill' in section 16-3-29 does not identify what level of intent is required, the Court of Appeals properly looked to the legislative history of section 16-3-29 and appellate decisions holding that 'attempt crimes require the State to prove the defendant had specific intent to complete the attempted crime.'" *Id.* (quoting *King*, 412 S.C. at 409, 772 S.E.2d at 192). Although the supreme court agreed with the State that certain language referenced from *State v. Sutton*, 340 S.C. 393, 532 S.E.2d 283 (2000), was dicta, it found *Sutton's* definition of "specific intent" to be an accurate statement of the law. *King,* 422 S.C. at 55–56, 810 S.E.2d at 22 ("'Attempted murder would require the specific intent to kill,' and 'specific intent means that the defendant consciously intended the completion of acts comprising the [attempted] offense.'" (quoting *Sutton*, 340 S.C. at 397, 532 S.E.2d at 285)).

In *State v. Gerald Williams*, our supreme court considered a case in which one of the issues raised involved "whether and to what extent the common law doctrine of transferred intent applies to the newly-codified crime of attempted murder." 427 S.C. 148, 149, 829 S.E.2d 702, 702 (2019). There, the petitioner was convicted of three counts of attempted murder related to his alleged shooting into an occupied mobile home where he knew his intended victim was present, but did not realize two other individuals were in the trailer as well. *Id.* at 150, 829 S.E.2d at 702. The court explained:

> Under the common law, transferred intent makes a whole crime out of two halves by joining the intent to harm one victim with the actual harm caused to another. Normally, transferred intent applies to general-intent crimes. However, attempted murder is a specific-intent crime in

---

However, the silence of an adversary should serve as an indicator to the court of the obscurity of the purported procedural flaw." (Toal, C.J., concurring in result in part and dissenting in part)).

> South Carolina, and we have not yet addressed whether
> transferred intent may supply the requisite mens rea for
> such a crime.
>
> Because this case was tried without objection as a
> general-intent crime, we find the doctrine of transferred
> intent applies in this instance. We therefore decline to
> address the applicability of transferred intent to a
> specific-intent crime such as attempted murder and
> vacate the portion of the court of appeals' opinion dealing
> with this issue.

*Id.* at 150, 829 S.E.2d at 702–03.[7]

Although not directly on point, our supreme court's more recent opinion in *State v. Smith*, 430 S.C. 226, 845 S.E.2d 495 (2020), is helpful to our analysis here. *Smith* involved an attempted murder conviction resulting from the accidental shooting of an innocent victim in the vicinity of a dispute among rival gang members. *Id.* at 228, 845 S.E.2d at 496. There, the court explained, "[i]t was undisputed Smith did not intend to harm [the victim]. Rather, Smith claimed he was acting in self-

---

[7] As in *Gerald Williams*, this case was tried before our supreme court's decision in *King*, but after the General Assembly's 2010 codification of the crime of attempted murder. *See* 427 S.C. at 153 n.4, 829 S.E.2d at 705 n.4. However, unlike the attempted murder charge in *Gerald Williams*, Williams's attempted murder charge was not tried as a general intent crime. In the charge to the jury here, the circuit court instructed that "an attempt includes a specific intent to do a particular criminal act with an act falling short of the act intended." The court's instructions on transferred intent and self-defense followed, without objection. Although a brief charge conference was held on the record prior to closing arguments, and defense counsel initially expressed concern about the transferred intent charge, the remainder of the charge discussion was omitted from the record on appeal. Williams has not appealed any error related to the circuit court's jury instructions and argues only that the circuit court erred in denying his motion for a directed verdict because "there was no substantial circumstantial evidence that appellant intended to kill or murder Ashely R." Given the facts of this case and these distinctions—including the unsettled status of the application of the doctrine of transferred attempt to statutory attempted murder—we disagree with our good colleague that any failure by Williams to challenge the circuit court's "transferred intent" jury instruction forecloses our review of the legal issue raised here.

defense by shooting at a group of men who had threatened him. *Id.* Smith missed his intended target and hit the victim by accident." *Id.* In conceding guilt to a felon-in-possession possession charge, but denying the attempted murder charge and asserting a claim of self-defense, "Smith implicitly acknowledged he had an express intent to kill the men at whom he was shooting, but asserted his actions were justified given his belief that he faced an imminent threat to his own life." *Id.* at 229, 845 S.E.2d at 496. Perhaps recognizing "[t]he law at the time of trial precluded an implied malice jury charge (based on the use of a deadly weapon) when a viable self-defense claim existed . . . . the State sought to create a new category of implied malice for 'felony attempted-murder,' with the predicate felony being the felon-in-possession charge." *Id.* The supreme court reversed Smith's conviction, addressing both the question of whether South Carolina recognizes the charge of felony attempted murder (finding that, like the majority of states, we do not) as well as the State's request for the erroneous implied malice charge. *Id.* at 230, 845 S.E.2d at 496–97.

As these issues were dispositive, the court declined to address Smith's additional argument that "the court of appeals erred in finding the doctrine of transferred intent applied to attempted murder because it is a specific-intent crime. *Id.* at 234 n. 9, 845 S.E.2d at 499 n. 9. In particular, Smith argue[d] the requisite specific intent necessary to support an attempted murder conviction must be the specific intent to kill *a specific person*." *Id.* The court's footnote then referenced the State's plan—if the court were to reverse Smith's convictions—to "charge Smith with three counts of attempted murder for shooting at the rival group, and one count of assault and battery of a high and aggravated nature (ABHAN) for shooting the victim" and noted that because ABHAN is a general-intent crime, "there would be no question on remand as to the applicability of the doctrine of transferred intent." *Id.*; *see also Gerald Williams*, 427 S.E.2d at 157, 829 S.E.2d at 707 ("It is well-settled in South Carolina that the doctrine of transferred intent applies to general-intent crimes.").

Considering this footnote along with our supreme court's recent pronouncements in *King* and *Gerald Williams*, along with Williams's acquittal here of the attempted murder of Malik Myers, we find the doctrine of transferred intent inapplicable in the context of the current indictment charging Williams with the attempt "to kill another person, Ashley R., with malice aforethought, either express or implied, by firing a gun numerous times at Malik Raekwon Myers, and striking Ashely R. with a bullet in her thigh." While it is undisputed that Williams was armed and fired his weapon in the parking lot, we cannot reconcile the jury's acquittal of Williams on the attempted murder charge for the shooting of Myers with its guilty verdict for an

attempted murder of Ashley R.  The language of the indictment and the State's contention that it was "proceeding under transferred intent and we do believe that [Williams] was firing his gun with malice and the bullet struck Ashely R." are incongruous with such a result.

At oral argument, the State reiterated it was proceeding under the doctrine of transferred intent and admitted Williams did not possess a specific attempt to kill Ashley R. with malice aforethought.  This was a reasonable position in light of our case law at the time of trial; however, we do not understand how the specific intent for an attempted murder for which Williams was acquitted (shooting at Myers) could be transferred for purposes of establishing a specific intent to kill Ashley R.—even if the doctrine of transferred intent were applicable to South Carolina's codification of attempted murder, a specific-intent crime.

**Conclusion**

We find the doctrine of transferred intent inapplicable to this charge of attempted murder.  The circuit court erred in denying Williams's directed verdict motion because § 16-3-29 requires proof of a specific intent to kill.  The jury acquitted Williams of the attempted murder of Myers, and no evidence in the record suggests Williams possessed *any* intent to kill Ashley R.  *See Gerald Williams*, 427 S.C. at 150, 829 S.E.2d at 702–03 (holding attempted murder is a specific-intent crime in South Carolina); *Brannon*, 388 S.C. at 503, 697 S.E.2d at 596 (explaining a defendant "is entitled to a directed verdict when the State fails to present evidence on a material element of the offense charged.").  Thus, we reverse Williams's conviction for attempted murder.  Given that we reverse Williams's conviction for attempted murder, "we must also reverse and remand his conviction for possession of a weapon during the commission of a violent crime."  *Smith*, 430 S.C. at 230 n.4, 845 S.E.2d at 497 n.4.  Williams "must be reconvicted of committing a violent crime before he can properly be found to have illegally possessed a weapon during that crime."[8]  *Id*.; *see also* S.C. Code Ann. § 16-23-490(A) (2015) (requiring where a person is in possession of a firearm "during the commission of a violent crime and is convicted of committing or attempting to commit a violent crime as defined in Section 16-1-60, he must be imprisoned five years, in addition to the punishment provided for the principal crime.").

---

[8] As the State notes in its brief, a proper remedy on remand "would be retrial of Williams on the charge of ABHAN and possession of a weapon during the commission of a violent crime."

**REVERSED and REMANDED.**

**THOMAS, J., concurs.**

**HUFF, J., dissenting in a separate opinion.**

**HUFF, J.:** I respectfully dissent. First, and most importantly, whether the doctrine of transferred intent was properly applied in this attempted murder case was never an issue raised to the trial court, and was certainly not a basis of Appellant's motions for directed verdict before the trial court. Accordingly, this argument is not preserved for our review. The only preserved issue is whether the State presented sufficient evidence that Appellant shot Ashley R. Because, viewing the evidence in a light most favorable to the State, I find the trial court properly submitted this case to the jury and denied Appellant's directed verdict motions, the inquiry should end here. However, further addressing the majority opinion, I also note Appellant never raised an issue to the trial court in regard to any inconsistencies with the verdicts and does not appear to have done so on appeal. Rather, the majority latches on to this, at least in part, as an underlying basis for reversing Appellant's convictions. Nonetheless, even assuming there is no error preservation problem in this regard as well, given the evidence and arguments presented at trial, I do not have the same problem the majority does in "reconcil[ing] the jury's acquittal of [Appellant] on the attempted murder charge for the shooting of Myers with its guilty verdict for an attempted murder of Ashley R." As more fully set out below, based upon the evidence presented at trial—particularly that by Appellant—as well as the argument of defense counsel, the jury could have concluded that Appellant fired the bullet that struck Ashley R. but that a third person fired the bullet that struck Myers. Finally, I disagree with the majority's conclusion that—based upon our supreme court's recent pronouncements in this area of law—the doctrine of transferred intent is inapplicable in this attempted murder case. Accordingly, I would affirm Appellant's convictions.

## I.    FACTUAL/PROCEDURAL BACKGROUND

Around 1:30 a.m. on May 2, 2015, gunfire broke out in the parking lot of Club Cream in Sumter, where a teen party had just taken place. Three individuals suffered gunshot wounds during the incident: Ashley R., a then fifteen-year-old female who was shot in her left leg; Malik Myers, a then seventeen-year-old male who was shot in his left leg and admitted he fired a .38 revolver during the incident; and Qawiyy McFadden, who was outside Appellant's car at the time of

the shooting and suffered a gunshot wound to his ear. Upon securing the scene, officers located a Springfield model XD .40 Smith and Wesson pistol in a grassy area, as well as six spent shell casings. All six of the fired cartridge cases were later determined to have been fired from the recovered Springfield Smith and Wesson—a gun Appellant admitted he fired and abandoned at the scene on the night in question. No other weapon was found at the scene and it was noted that if a revolver had been shot, it would not have left any shell casings, as such would have remained in the cylinder of the gun.

Appellant was indicted on two counts of attempted murder: one for the attempted murder of Myers, based upon his firing a gun at Myers, and the second for the attempted murder of Ashley R., based upon his firing a gun at Myers but striking Ashley R. Appellant was also charged with possession of a weapon during the commission of a violent crime. Myers was likewise indicted on two counts of attempted murder: one for the attempted murder of Appellant, based upon his firing a gun at Appellant, and the second for the attempted murder of McFadden, based upon his firing a gun at Appellant and hitting McFadden. He was also charged with possession of a weapon during the commission of a violent crime stemming from this incident. Myers thereafter entered a guilty plea in regard to this matter and was serving his sentence at the time of Appellant's trial.

On May 4, 2015, Myers gave a statement to law enforcement indicating that on the night in question Appellant bumped into him while in the club and also made a hand gesture, pointing his finger at Myers as if he had a gun, pulling a trigger. Myers indicated in his statement that Appellant left the club first and, when Myers went outside and saw Appellant's car, he walked to his own car and retrieved a .38 gun. He was attempting to leave when he heard shooting and looked behind him to see that it was Appellant pointing a black gun at him and shooting. Myers stated he pulled out the .38 and shot back, "shoot[ing] [Appellant's] car about 5 time[s]." Myers indicated he had been shot in his left leg and was taken to the hospital by a friend. He stated Appellant "had beef with [him] in the pas[t]," saying things to him and trying to fight him. Myers also noted in his statement that there was "a girl [he] was playing dice[] [with] on Poplar Square[] [and] she got shot by [Appellant's] gun." Myers's statement was published to the jury.

While on the stand in Appellant's trial, Myers was less than cooperative, denying that he and Appellant had ever had disagreements, denying anything happened between him and Appellant at the club that night, and denying that there was an altercation between them. When confronted with his written statement, Myers claimed he had "just come from the hospital" when he gave his statement and he

"wasn't thinking right."  He denied that he and Appellant bumped into each other that night, and when asked if Appellant shot him that night, Myers replied, "Nope. I don't know."  He agreed that he told law enforcement that Appellant bumped into him that night, but testified he really did not see his face and only "figured it was [Appellant]."  He acknowledged, however, that he had identified Appellant as the person who made the hand gestures at him and told law enforcement that Appellant began shooting at him and he shot back.  He testified that once he was outside the club, he armed himself with a .38 revolver, not because of an altercation inside the club with Appellant but "because anything could have happened after the club."  When asked on the stand how many shots he fired at Appellant, Myers stated he fired all six shots from the revolver.  Myers testified he did not know if Appellant was shooting or not, and he just knew that he got shot and he did not know who shot him.

Ashley R. testified she exited the club and was in the parking lot when she heard "fight, gun, shooting."  By the time she could duck down, she felt something akin to a bee sting, touched her leg, and began to panic.  She heard two or three gunshots and saw Myers begin to shoot after those gunshots.  She specifically testified she did not see Myers shoot first.[9]  About four or five gunshots were fired before she felt herself get hit by a bullet.  She told law enforcement she did not know who it was, but there was an unknown black male—and she described his clothing—who was one of the people involved in the shooting that night.  She did not know Myers at the time of the shooting, but he later apologized to her about the incident and that was how she got to know him.  Ashley R. testified she had been at Poplar Square earlier on the day of the incident playing dice, and she had seen one of the unknown suspects there at that time.  This person at Poplar Square was the person she identified as the one who started shooting *after* she heard the two

---

[9] The majority indicates Ashley R. "admitted in her written statement to police, she identified Myers as the man who started the shooting and her statement did not include that she heard shots before Myers fired his weapon."  My reading of the record is not in accord.  On cross-examination, Ashley R. was asked if she identified to the police the man who started the shooting as the one who she saw at Poplar Square.  She responded, "Yes, *but. . . after I heard the two shots shooting*."  Thus, she clearly indicated she had identified the person she saw at Poplar Square as one of the shooters, but not as the first shooter.  Further, when challenged as to whether she mentioned to the police that someone else had shot first, Ashley R. twice insisted that she did write that, and she thereafter continued to maintain that she heard two shots before Myers began shooting.  Ashley R.'s written statement is not included in the record.

shots, i.e., Myers. Ashley R. did not know who fired the first two shots. Asked why Myers would apologize to her if he had not shot her, Ashley R. stated she was not sure. She clarified that she heard at least two people shooting guns that night, and she did not know who fired the gun that resulted in her injury. Myers's then girlfriend, Chelsea Rogers, testified that she exited the club with Myers following behind her that night; as she got to the car she heard gunshots; when the gunshots started, Myers who had been behind her, began running toward his friends on the opposite side of the gunfire; and she saw Myers when the first gunshot rang out and he was not firing.

South Carolina Law Enforcement (SLED) Agent Michelle Eichenmiller, qualified as an expert witness in ballistics and firearm examination, testified that she tested the six cartridge cases found at the scene, the bullet recovered from Ashley R., and a bullet test fired from the gun recovered at the scene. The agent opined all the fired cartridge cases found at the scene were fired by the Springfield model XD .40 Smith and Wesson. When she compared the test fired bullet to the bullet recovered from Ashley R., however, there were not enough individual characteristics to form an opinion as to whether the bullet recovered from Ashley R. was fired from that gun. Agent Eichenmiller observed they "rifled the same," they had "six lands and grooves" that were approximately the same width, and both had six twists to the right, but the comparison was deemed inconclusive. Agent Eichenmiller testified it was not uncommon to be unable to make a conclusive match, even when she has observed a bullet shot from a firearm, explaining that a well-produced or well-cared for firearm may not have enough individual marks from which to form an opinion, and a Springfield is typically a little bit better manufactured gun. She testified the recovered bullet could have been fired from a 10-millimeter firearm or a .40 Smith and Wesson. When asked if it could have been fired from a .38, the agent stated it was a little bit larger than a .38 and, depending on the firearm, she had seen some that had worn barrels that it possibly could have been fired from, "but not usually." Agent Eichenmiller also agreed there were other weapons that would fire a .40 round, but observed those firearms have different rifling than what they saw in the Springfield and in the bullet they had. Notably, the State presented no evidence concerning ballistics or the bullet wound in regard to Myers other than he sustained an injury to his left leg.

Detective Nathalie Kelly testified Appellant gave a statement on May 6, 2015, following his arrest. Appellant's statement was admitted without objection and published to the jury, providing as follows:

I got to Club Cream at like 11:00 in my green Mustang. I went in the club and danced around until the party was over. When I got out, I was sitting in my car about to leave. I seen [Myers] about to walk up to my car, so I got out and went to the back, opened my car, and by the time I got to the back to open my car, [Myers] had his gun and I had a gun. So he started shooting, so I started shooting, but I was shooting in the back of my car so the bullets wouldn't hit nobody. And I didn't want him to think I was shooting in the air. And when I was inside the club, [Myers] bumped into me, so I already knew he was up to something.

I was behind my car shooting into my car so my gun looked like it was pointing at him. He was in the front of my car shooting and threw my gun under the tree because I seen a security.

Detective Kelly testified that, outside of his written statement, Appellant indicated that the gun they recovered was the gun he referred to in his statement as being thrown under a tree that he used that night. Detective Kelly testified that Myers was charged with shooting at Appellant and with shooting McFadden, who had been in Appellant's car, and that Appellant's Mustang sustained bullet holes. She further stated that Appellant claimed he shot into the back of his car. Law enforcement had several pictures depicting holes in the canopy portion of Appellant's car.

Following Detective Kelly's testimony, the State rested, at which point Appellant moved for a directed verdict. The following colloquy occurred:

[Defense Counsel]: . . . . Your, Honor, at this time I would move for a directed verdict on behalf of my client. I certainly don't think the State has met its burden beyond a reasonable doubt. From its own witness testimony today, it was very difficult for [Myers]. Said he's not sure who shot him. Of course, we sort of heard from him, it's sort of hard to believe what he says. But even some of the other testimony, even the expert witness they had, she couldn't say conclusively that that bullet that

was pulled out of Ashley's leg was shot by this weapon that we have here in court.

[The Court]:  She didn't say it was not, either.

[Defense Counsel]:  Yeah, but she didn't say it was, either.  Anyway, I'm making that motion here on — — on those grounds, Your Honor.

. . .

[Solicitor]:  Your Honor, there's testimony on the record from multiple witnesses, some through impeachment purposes, but [from] multiple witnesses that [Appellant] shot first.  [Appellant] himself admitted that there had been bad blood between them in the club.  [] Myers through his statement under impeachment acknowledged they had bad blood in the club.  They both armed themselves, and started a shootout.  I think this becomes a jury question.  I certainly think we've established malice aforethought.  As it pertains to Ashley R., Your Honor, I think there is strong evidence that the bullet did come from the gun.  The barreling, the rifling is all the same.  It was not able to be conclusive, but there's plenty for me to argue, and I think it's a jury question at this point.  And also just specifically because he was not shooting directly at Ashley, I would point out that we're proceeding under transferred intent and we do believe that he was firing his gun with malice and the bullet struck Ashley R.

. . .

And Your Honor, the other thing, these are violent crimes and he's admitted he had a gun.

[The Court]:  All right.  Rule 19 of the South Carolina rules of criminal procedure provides that upon the motion of the defendant or on its own motion, the Court should direct a verdict for defendant — — in the defendant's

favor on any offense charged in [an] indictment after the evidence on either side is closed if there's a failure of competent evidence tending to prove the charges in the indictment. . . . [T]he rule goes on to say that in ruling on this motion, the trial judge shall consider only the existence or nonexistence of the evidence and not its weight.

My recollection of the testimony was that — — whether it's believable or not does not matter, but my recollection of the testimony is that the defendant, [Appellant], fired first and was firing at both [] Myers and that by transferred intent, at the other victim in this case. And my job is to determine the existence or nonexistence of the evidence and not its weight. That is a matter solely for the jury to determine, and it would be improper for me to interpose my opinion of the evidence or to weigh the evidence and grant a . . . directed verdict if there is any evidence in the record. And there is evidence in the record, both direct and circumstantial that would support the charges in this case. The motion is respectfully denied.

Thereafter, Appellant presented witnesses on his own behalf. First, McFadden testified he left Club Cream around 1:00 a.m. and was sitting in Appellant's Mustang[10] when he saw everyone coming out of the club, at which time he exited the car to see what everyone was planning for the night. Then, "shots started going off" and he saw Appellant go toward the back of his car. By about the first five shots, McFadden had been shot in his left ear. He did not see who was shooting, and he did not see Appellant shooting. After he was shot, Appellant drove him to the hospital.

Appellant also presented Crime Scene Investigator Amanda Snapp as his witness. Investigator Snapp took pictures of Appellant's car several days after the incident. Investigator Snapp stated she was not an expert and could not testify concerning

---

[10] McFadden testified Appellant's car had been backed into the parking space with his car facing toward the club.

the trajectory of a bullet. However, she did state she found what appeared to be five holes in the roof line of Appellant's vehicle. Additionally, when asked about the direction of the bullets, she stated, "there [were] no bullet holes in the front of the vehicle, so I can only imagine that they came from the back of the vehicle, most likely."

Lastly, Appellant testified in his own defense. Like Myers, he was seventeen years old at the time of the incident. Appellant testified that on the night in question, Myers bumped into him while inside the club, and he knew "something was going to happen" once they left the club because the two of them "had problems since [they were] in middle school." Appellant stated he exited the club around 1:30 and went to his car, which he had backed into a parking space. He saw Myers coming toward his car and observed Myers had a gun. According to Appellant, he then got out of his car and when he got to the back of his car, Myers started shooting. That's when Appellant started shooting and then ran off and threw his gun under a tree when he saw a security guard. Appellant explained that when he was shooting, he shot into the back of his car so Myers would think he was shooting at him and he would run off, but Myers did not run. Rather, Myers came close to shooting Appellant and Appellant ran. When Appellant returned to the car, he found out McFadden had been shot and took him to the hospital. Appellant stated he was not sure why Myers wanted to shoot him but he knew they "had beef" since middle school. He denied shooting first, claiming Myers shot first, Myers shot more than one time, and there were no bullet holes in the front of his car but several in the rear where Appellant was standing. Appellant denied shooting Myers or Ashley R. that night.

On cross-examination, Appellant admitted the shell casings found at the scene came from his black Springfield .40 that he dropped in the bushes. Appellant stated he was not sure if he fired every round directly into his car, but he tried to get all of them in the car, and there were five holes in the top of his car. When asked what happened to the sixth bullet, Appellant stated that he "probably shot it into the ground." He stated "everything was happening too fast" but that he knew that he "was shooting the back of [his] car so [he] wouldn't hit anybody." When questioned about how many rounds Myers fired at him, Appellant stated it was more than one but he was not sure if it was more than two or three. When the solicitor then asked if he and Myers were the only two shooters out there that night, Appellant replied, "No. It was other shooters out there because I — — yeah. It was other shooters out there." When the solicitor challenged Appellant as to why he had not stated that during questioning by defense counsel or told Investigator Kelly, Appellant maintained he had told both defense counsel and the

investigator, and continued to maintain in his testimony that there was another shooter that night.

The defense rested and the State called Investigator Kelly in reply, who testified Appellant never indicated to her that there was any other shooter in this matter besides him and Myers. After the State again rested, defense counsel stated, "Your Honor, just move again for a directed verdict in this matter for the reasons I stated earlier." The trial court again noted it was to consider only the existence or nonexistence of evidence, not its weight, found there was evidence in the record from which the jury could conclude that the offenses occurred, and denied Appellant's motion.

During the solicitor's closing argument, he argued Appellant was guilty of the attempted murder of Ashley R. based upon the doctrine of transferred intent. Defense counsel argued in closing that the defense did not contest the fact that Myers and Ashley R. were shot, but argued the State failed to prove that Appellant shot both of them. Counsel also argued the evidence showed that five bullets entered the back of Appellant's car, which left one remaining bullet, and suggested this one "magic bullet" would have had to hit Myers, "make a right turn, go around Ashley, [and] hit Ashley on the other side on her left leg" to fit the State's theory.

During a discussion on jury charges, the solicitor requested an instruction on transferred intent, which the court indicated it intended to charge with no objection from the defense.[11] The trial court thereafter instructed the jury on the doctrine of transferred intent without objection. The jury was instructed that if it were to find Appellant not guilty of both the attempted murder of Myers and Ashley R., it was to go no further in its deliberations, but if it found Appellant "guilty of either of the attempted murder charges," it was to then consider the separate charge of possession of a weapon during the commission of a violent crime. Accordingly, the jury was implicitly instructed that permissible verdicts included guilty verdicts as to only one of either of the attempted murder charges. Following deliberations,

---

[11] We note the trial court asked defense counsel if he believed a charge on transferred intent was appropriate, to which counsel replied, "Yes, sir," but he then noted some hesitancy because he mistakenly believed—as verified by review of the indictments—that Myers had been charged with shooting Ashley R. When it was clarified that Myers had not been charged with shooting Ashley R. but had been charged with shooting McFadden and Appellant had been charged with shooting Ashley R., defense counsel raised no objection to a transferred intent charge.

the jury found Appellant not guilty of the attempted murder of Myers, guilty of the attempted murder of Ashley R., and guilty of possession of a firearm during the commission of a violent crime.

## II.  STANDARD OF REVIEW

"When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight." *State v. Prather*, 429 S.C. 583, 608, 840 S.E.2d 551, 564 (2020) (quoting *State v. Hernandez*, 382 S.C. 620, 624, 677 S.E.2d 603, 605 (2009)).  "In an appeal from the denial of a directed verdict motion, the appellate court must view the evidence in the light most favorable to the State." *Id.* (quoting *State v. Cope*, 405 S.C. 317, 348, 748 S.E.2d 194, 210 (2013)).  "When the evidence presented merely raises a suspicion of the accused's guilt, the trial court should not refuse to grant the directed verdict motion." *State v. Phillips*, 416 S.C. 184, 192, 785 S.E.2d 448, 452 (2016).  "However, the trial court must submit the case to the jury if there is 'any substantial evidence which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced.'" *Id.* at 192-93, 785 S.E.2d 448 (quoting *State v. Mitchell*, 341 S.C. 406, 409, 535 S.E.2d 126, 127 (2000)).

## III.  LAW/ANALYSIS

On appeal, Appellant argues there is no substantial circumstantial evidence that he shot Ashley R. or that he specifically intended to attempt to murder her.  He argues the same was true of Myers, the jury acquitted him of that attempted murder, and if he did not possess the intent to shoot Myers, it is hard to fathom how the trial court thought there was substantial circumstantial evidence he attempted to shoot and kill Ashley R.  Appellant points to the testimony of the SLED expert that the comparison of the bullet removed from Ashley R.'s leg to that of one test fired from the Springfield .40 caliber weapon yielded an inconclusive result.  He maintains that such an inconclusive result does not rise to the level of substantial circumstantial evidence, and further argues "there is no evidence [he] intended to shoot and kill Ashley."  Appellant contends the trial court committed error in reasoning that the State carried its burden at the directed verdict stage because he could be guilty by reason of transferred intent.  I disagree.

### A. Preservation of Transferred Intent Argument

It is well settled that, in order to be preserved for appellate review, an issue must be raised to and ruled upon by the trial court. *State v. McKnight*, 352 S.C. 635,

646, 576 S.E.2d 168, 174 (2003). "The general rule of issue preservation is if an issue was not raised to and ruled upon by the trial court, it will not be considered for the first time on appeal." *State v. Porter*, 389 S.C. 27, 37, 698 S.E.2d 237, 242 (Ct. App. 2010). "Imposing this preservation requirement is meant to enable the trial court to rule properly after it has considered all the relevant facts, law, and arguments." *Id.* at 38, 698 S.E.2d at 242. An appellate court is limited by appellate rules that allow the court to consider *only the precise question* that was before the trial court and ruled upon by the court. *State v. Whitten*, 375 S.C. 43, 47, 649 S.E.2d 505, 507 (Ct. App. 2007). "[E]rror preservation has been a critical part of appellate practice in this State for a long time, serving to ensure . . . that we do not reach issues which were not ruled upon by the trial court." *Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 329, 730 S.E.2d 282, 285 (2012). "Issue preservation rules are designed to give the trial court a fair opportunity to rule on the issues, and thus provide us with a platform for meaningful appellate review." *Id.* (quoting *Queen's Grant II Horizontal Prop. Regime v. Greenwood Dev. Corp.*, 368 S.C. 342, 373, 628 S.E.2d 902, 919 (Ct. App. 2006)). "[T]hese rules must . . . be applied consistently and not selectively." *Id.* "[T]his is not a 'gotcha' game aimed at embarrassing attorneys or harming litigants, but rather is an adherence to settled principles that serve an important function." *Id.* at 329-30, 730 S.E.2d at 285. "While it may be good practice for us to reach the merits of an issue when error preservation is doubtful, we should follow our longstanding precedent and resolve the issue on preservation grounds when it clearly is unpreserved." *Id.* at 330, 730 S.E.2d at 285. "A party need not use the exact name of a legal doctrine in order to preserve it, but it must be clear that the argument has been presented on that ground." *State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 694 (2003). "[T]he issue must be sufficiently clear to bring into focus the precise nature of the alleged error so that it can be reasonably understood by the [trial court]." *Herron v. Century BMW*, 395 S.C. 461, 466, 719 S.E.2d 640, 642 (2011).

As noted, the only basis for Appellant's directed verdict motion was that the State failed to meet its burden to prove he shot Myers or that the bullet that struck Ashley R. was shot by Appellant's weapon. Because Appellant was acquitted of the attempted murder of Myers, the only preserved issue on appeal is whether the trial court erred in denying his motion for directed verdict as related to the charge concerning Ashley R., i.e., whether there was sufficient evidence Appellant's bullet struck Ashley R. The Solicitor specifically addressed the argument actually raised by Appellant, asserting there was "strong evidence" that the bullet which hit Ashley R. did come from Appellant's gun. Although the solicitor included in his response that the State was proceeding under the theory of transferred intent in

regard to Ashley R., the mere fact that he noted this as the State's theory of the case, and the trial court recognized this as the State's theory, did not raise to the trial court that Appellant contested the applicability of that theory. Notably, when the solicitor specifically stated during the directed verdict motion that the State was proceeding on this basis, Appellant raised no objection and made no argument that he was entitled to a directed verdict because transferred intent could not be applied to a specific intent crime. Further, the trial court charged transferred intent to the jury without objection, thereby evidencing Appellant's acquiescence to the theory in his trial. Indeed, as observed by the State in oral argument, the solicitor made clear from the outset of the case the State was proceeding with the attempted murder of Ashley R. charge—through the theory of transferred intent—based upon Appellant's firing a gun at Myers, and at no time during the trial did Appellant object to that theory. Accordingly, at a minimum, the theory of transferred intent was tried by consent, and Appellant should not now be allowed to grasp onto it as a basis for his directed verdict motion simply because it was mentioned by the solicitor as the State's theory of the case when presenting the State's case in response. I do not believe that in any manner the trial court could have possibly understood from Appellant's directed verdict motion that he was challenging the sufficiency of the evidence on the attempted murder charge in relation to Ashley R. on the basis that Appellant was required to have a specific intent to shoot her and could not be guilty by virtue of transferred intent. While the trial court clearly recognized—and restated—that the State was proceeding under the theory of transferred intent in this attempted murder, specific-intent crime, Appellant did not raise to the court that such was improper, and neither did the trial court consider "all the facts, law, and arguments" regarding the same and make a ruling on such. *See Porter*, 389 S.C. at 37-38, 698 S.E.2d at 242 ("Imposing [the preservation requirement that an issue be raised to and ruled upon by the trial court] is meant to enable the trial court to rule properly after it has considered all the relevant facts, law, and arguments."). Because the trial court was not given an opportunity to consider all the relevant facts, law, and argument and rule on this issue, I would find it is not preserved for appellate review.[12]

---

[12] I acknowledge the State did not challenge Appellant's preservation of this issue in its appellate brief. It is well settled, though, that an appellate court is "not precluded from finding an issue unpreserved even when the parties themselves do not argue error preservation to us." *Lewis*, 398 S.C. at 329, 730 S.E.2d at 285 (2012). As aptly observed by the majority, an adversary's silence may "serve as an indicator to the court of the obscurity of the purported procedural flaw." *Id.* at 333, 730 S.E.2d at 287 (Toal, C.J., concurring in result in part and dissenting in part). I note, however, at the time of the filing of its brief, the State relied on this court's

As to Appellant's argument that the evidence was insufficient to rise to the level of substantial circumstantial evidence that he shot Ashley R., I also disagree. Though the evidence was inconclusive as to whether the bullet recovered from Ashley R.'s leg was fired from Appellant's weapon, it is undisputed that all six of the cartridges at the scene were fired from Appellant's Springfield model XD .40 Smith and Wesson. Further, the SLED expert testified a comparison of the bullet fired from that weapon and the bullet retrieved from Ashley R.'s leg showed they were rifled the same, they had "six lands and grooves" that were approximately the same width, and they had six twists to the right. Though a .38 caliber weapon could fire a .40 round if the barrel was worn enough, the expert testified that was not usually the case. Further, while there were other weapons that could fire a .40 round, those other weapons did not have the same rifling as seen on a Springfield. Additionally, aside from the ballistic evidence, Ashley R. identified Myers as the person she had seen earlier on the day of the shooting when she was at Poplar Square playing dice, and in his written statement to law enforcement, Myers indicated that a girl he was playing dice with on Poplar Square "got shot by [Appellant's] gun" that night. Thus, there is additional evidence Appellant shot Ashley R. that night. Accordingly, viewing the evidence in the light most favorable to the State, I would find no error in the trial court's determination of the sufficiency of evidence to send the matter to the jury. *See Prather*, 429 S.C. at 608, 840 S.E.2d at 564 ("When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight." (quoting *Hernandez*, 382 S.C. at 624, 677 S.E.2d at 605)); *id.* ("In an appeal from the denial of a directed verdict motion, the appellate court must view the evidence in the light most favorable to the State." (quoting *Cope*, 405 S.C. at 348, 748 S.E.2d at 210)); *Phillips*, 416 S.C. at 192-93, 785 S.E.2d at 452 ("[T]he trial court must submit the case to the jury if there is 'any substantial evidence which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced.'" (quoting *Mitchell*, 341 S.C. at 409, 535 S.E.2d at 127)).

## B. Verdict Inconsistencies

Appellant argues the jury acquitted him of the attempted murder of Myers, and if he did not intend to shoot Myers, "it is hard to fathom how the [trial court] thought

recent case law—discussed further below—in which this court unwaveringly applied the doctrine of transferred intent to the crime of attempted murder. Further, at oral argument, the State left no doubt that it was, in fact, challenging the preservation of this issue on appeal.

there was substantial circumstantial evidence [he] attempted to shoot and kill Ashley R." The majority notes it "cannot reconcile the jury's acquittal of [Appellant] on the attempted murder charge for the shooting of Myers with its guilty verdict for an attempted murder of Ashley R.," maintaining the indictment language and the State's contention it was proceeding under the doctrine of transferred intent whereby Appellant was firing his gun with malice and struck Ashley R. were "incongruous with such a result." In effect, Appellant and the majority are maintaining Appellant's convictions should be reversed, in part, based upon the inconsistencies in the verdicts. I disagree. First, Appellant has not set forth any inconsistency in the verdict in his issues on appeal. *See* Rule 208(b)(1)(B), SCACR ("Ordinarily, no point will be considered which is not set forth in the statement of the issues on appeal."). At any rate, I have no problem reconciling the jury's verdict of acquittal on the charge in regard to Myers and the guilty verdict in regard to Ashley R. I readily concede the jury could have returned guilty verdicts of the attempted murder of Myers and Ashley R. based on its belief that Appellant shot six bullets, five hit his car, and one hit Ashley R., with his intent that a bullet strike Myers but did not. Whether a bullet he aimed at Myers actually struck him is of no consequence, for attempted murder does not require an injury to the person. *See* S.C. Code Ann. § 16-3-29 (2015) ("A person who, with intent to kill, attempts to kill another person with malice aforethought, either expressed or implied, commits the offense of attempted murder."). However, it is understandable that the jury did not appreciate this nuance, especially given the fact that (1) Myers discouraged the jury from holding Appellant responsible for shooting him; (2) the defense introduced evidence there was a third shooter present; (3) the State presented evidence the bullet that struck Ashley R. could have been fired from the gun used by Appellant that night but presented no evidence concerning the bullet that struck Myers; (4) the defense argued to the jury that five of the six bullets shot by Appellant hit Appellants car and it would have had to have been a "magic bullet" to have hit both Ashley R. and Myers, implying to the jury that Appellant could not be guilty of shooting both of them; and (5) the jury was implicitly instructed a permissible verdict included one in which Appellant could be found guilty on either count of attempted murder without being found guilty on the other. Notably, Appellant raised no exception to the jury instruction in this regard, nor did he raise any argument to the trial court that the verdicts were inconsistent. Further, while Appellant argues it is hard to fathom how the trial court could think there was substantial circumstantial evidence he attempted to shoot and kill Ashley R. if he did not intend to shoot Myers—as evidenced by Appellant's acquittal of the attempted murder of Myers—what Appellant fails to appreciate is that the trial court was not looking at the evidence through the lens of what the jury would eventually, in fact, determine. Rather, the

trial court was looking at the evidence through the lens of what the jury could, based upon the evidence, determine. *See Phillips*, 416 S.C. at 193, 785 S.E.2d at 452 ("[T]he lens through which a [trial] court considers circumstantial evidence when ruling on a directed verdict motion is distinct from the analysis performed by the jury." (quoting *State v. Bennett,* 415 S.C. 232, 236, 781 S.E.2d 352, 354 (2016)). In short, I believe any perplexities in the jury's verdict result, not from the trial court's proper denial of Appellant's succinct directed verdict motion, but from the manner in which the case was tried and the successful argument of trial counsel that Appellant could not be responsible for both bullets that hit Ashley R. and Myers.

### C. Transferred Intent and Attempted Murder

Finally, I disagree with the majority's determination that, given Appellant's acquittal of attempted murder as relates to Myers, the recent pronouncements by our supreme court in *State v. King*, 422 S.C. 47, 810 S.E.2d 18 (2017), *State v. Gerald Williams*, 427 S.C. 148, 829 S.E.2d 702 (2019) (*Gerald Williams II*), and *State v. Smith*, 430 S.C. 226, 845 S.E.2d 495 (2020) (*Smith II*) mandate a determination that the doctrine of transferred intent is inapplicable to the attempted murder charge as relates to Ashley R. As noted, the fact that Appellant was acquitted of the attempted murder of Myers is understandable based upon the manner in which the case was tried before the jury. Whether certain arguments and motions should have been raised by defense counsel at trial is a matter perhaps to be addressed in a post-conviction relief action, but matters not addressed to the trial court should not be the basis for reversal on appeal.

Undoubtedly, *King* provides the crime of attempted murder is a specific-intent crime which requires proof of specific intent to commit murder. 422 S.C. at 55, 810 S.E.2d at 22. However, what remains to be resolved by our supreme court is whether the doctrine of transferred intent applies to attempted murder. This court, however, has twice addressed the issue, and on both occasions has answered the question in the affirmative.

In the first case, *Gerald Williams I*, this court found the doctrine of transferred intent applied to that attempted murder case, finding the statute governing the crime did not require the specific intent to murder a specific victim; rather, the requisite specific intent for attempted murder is the specific intent to commit murder. *State v. Gerald Williams*, 422 S.C. 525, 542, 812 S.E.2d 917, 925-26 (Ct. App. 2018), *aff'd in part as modified, vacated in part*, 427 S.C. 148, 829 S.E.2d 702 (2019). However, our supreme court granted certiorari and ultimately vacated

the portion of this court's opinion in *Gerald Williams I* concerning the application of transferred intent in an attempted murder scenario. *Gerald Williams II*, 427 S.C. at 158, 829 S.E.2d at 707. There, our supreme court noted this court had found the doctrine of transferred intent applied to the specific-intent crime of attempted murder; however, inasmuch as Williams failed to challenge the trial court's jury instruction that specific intent to kill was not an element of attempted murder, but there must be a general intent to commit serious bodily injury, that unappealed ruling became the law of the case. *Id.* at 157, 829 S.E.2d 706-07. Accordingly, Williams's attempted murder case was tried, without objection, as a general-intent crime. *Id.* at 158, 829 S.E.2d 707. Because this court had erroneously "treated the case as if it had been tried as a specific-intent crime," our supreme court vacated that portion of our opinion dealing with the issue of transferred intent and, pointedly, decided to "*leave for another day* the determination of whether the doctrine [of transferred intent] applies to attempted murder." *Id.* at 157-58, 829 S.E.2d 707 (emphasis added).

In the second instance, *Smith I*, this court addressed numerous issues raised by Smith following his conviction for attempted murder. In particular, Smith argued three separate bases for reversal: (1) he was entitled to a directed verdict based on the State's failure to prove he had the specific intent to kill the victim; (2) he was entitled to a mistrial based upon improper statements made by the prosecution in closing arguments; and (3) the trial court erred in instructing the jury it could infer malice based upon the "felony murder rule." *State v. Smith*, 425 S.C. 20, 24, 819 S.E.2d 187, 189 (Ct. App. 2018), *rev'd and remanded*, 430 S.C. 226, 845 S.E.2d 495 (2020). This court affirmed Smith's conviction finding (1) a mistrial was not warranted based upon the solicitor's improper remarks, 425 S.C. at 39, 819 S.E.2d at 197, and (2) no error under any of the several bases argued by Smith concerning the "felony murder rule." 425 S.C. at 39-47, 819 S.E.2d at 197-201. Further, we disagreed with Smith's argument that "he was entitled to a directed verdict on the attempted murder charge because the State was required to show his specific intent to kill [the victim] and the State could not rely on the transferred intent doctrine to make this showing." 425 S.C. at 28, 819 S.E.2d at 191. After examining, among other things, our law on transferred intent, this court concluded "the State properly relied on the transferred intent doctrine to show specific intent as to [the victim]" and affirmed the denial of Smith's directed verdict motion. 425 S.C. at 32-34, 819 S.E.2d at 193-94. Our supreme court granted certiorari and issued an opinion reversing and remanding Smith's attempted murder and possession of a weapon during the commission of a violent crime convictions. *Smith II*, 430 S.C. at 230, 845 S.E.2d at 496-97. The basis for the reversal was solely on improper jury instruction because (1) "felony attempted-murder is not a recognized crime in

South Carolina, and, therefore, any jury charge to that effect [is] error" and (2) "trial courts may no longer give an implied malice charge when there has been evidence presented that the defendant acted in self-defense." 430 S.C. at 230, 845 S.E.2d at 496. Although Smith also argued that this court erred in finding the doctrine of transferred intent applied to attempted murder because it was a specific-intent crime—which required the specific intent to kill a specific person— our supreme court specifically declined to reach the issue, finding resolution of the other issues dispositive and noting the State indicated its intent, on retrial, to charge Smith with a general intent crime for the shooting of the victim in that matter. 430 S.C. at 234 n.9, 845 S.E.2d at 499 n.9.

In sum, I find nothing in *King*, *Gerald Williams II*, and *Smith II* to indicate our courts have concluded the doctrine of transferred intent is inapplicable to a charge of attempted murder. Further, I can discern no analysis from the majority as to why transferred intent should not apply in such a case. Inasmuch as our supreme court chose not to address the issue, I would decline to depart from the well-reasoned analysis as set forth by Judge Geathers in *Smith I*. However, as I expressed from the outset, I do not believe we should reach this issue. Appellant failed to raise this as a basis for his motion for directed verdict. Further, even assuming the mention of the theory by the State and the trial court during discussion of the motion was sufficient to encompass the theory as a basis of Appellant's directed verdict motion, I do not believe the question of whether the doctrine of transferred intent applied to the specific-intent crime of attempted murder here should be addressed, as Appellant never challenged the trial court's instruction to the jury on transferred intent. *See Gerald Williams II*, 427 S.C. at 157-58, 829 S.E.2d at 707 (vacating the portion of this court's decision dealing with the issue of transferred intent and a specific-intent crime because Williams failed to challenge the trial court's instruction to the jury that specific intent to kill was not an element of the crime of attempted murder, but there must be a general intent to commit serious bodily injury and, accordingly, Williams's attempted murder case was tried, without objection, as a general-intent crime).